In re James I. PETERSON, Debtor.

Leonard L. GRIFFITHS, III; Gary W. Powell; Robert H. Sanderman; and Ronald E. Rinker, Plaintiffs,

v.

James I. PETERSON, Defendant.

Bankruptcy No. 86–B–05883 E.
Adv. No. 86 C 0968.

United States Bankruptcy Court,
D. Colorado.

Sept. 19, 1988.
Amended Order For Judgment
Oct. 28, 1988.

---

Thomas D. Birge, Mark Quinn, Roath & Brega, P.C., Denver, Colo., for plaintiff.

Harry M. Sterling, John T. Sullivan, Sterling and Miller, P.C., Denver, Colo., for defendant.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge, Sitting by Special Designation.

The instant adversary proceeding was commenced by Ronald Rinker (Rinker) and three others on October 29, 1986, as a companion to two lawsuits commenced by Rinker and his three co-plaintiffs in Colorado State District Court and the Federal District Court for Colorado. The state case, commenced by complaint filed July 3, 1985, was scheduled for trial commencing January 26, 1987, and all four plaintiffs in that suit were granted relief from stay to proceed with both the state as well as federal litigation. By the instant adversary proceeding Rinker seeks a bankruptcy court determination that any liability assessed to the defendant James I. Peterson (Peterson) in either the state or federal cases be declared nondischargeable in bankruptcy. The three other co-plaintiffs have previously stipulated to dismissal of their bankruptcy court claims and Rinker's claim is now maintained by his assignee, Integrated Resources Equity Corporation. By the complaint it is alleged that the defendant, James I. Peterson, acting in a fiduciary capacity and by means of actual fraud caused and induced Rinker to invest in a limited partnership, the object thereof to purchase a world class Arabian stallion. The investment failed to show a profit and Rinker, through his assignee, seeks to have the sums lost to this investment as established in the state and federal proceedings declared nondischargeable under either section 523(a)(4) or section 523(a)(2)(A) of the Bankruptcy Code. Peterson generally denies that his relationship with Rinker relating to the horse investment gave rise to a cause of action under either of these Code sections. Trial of the instant case was commenced before the undersigned sitting by special designation on December 9, 1987, and after considerable hiatus, concluded on June 6, 1988.

### Findings of Fact

1.

Peterson, an affiliate of International Planning Limited, holds a law degree and spent a number of years in the field of financial planning. In 1983 he became affiliated with International Planning Limited as an investment adviser within the meaning of the Investment Advisers Act of 1940 (15 U.S.C. § 80b–1 et seq.) and became subject to the provisions of the Act as well as rules adopted thereunder as set forth in 17 C.F.R. § 275.0–2 et seq. As part of S.E.C. registration requirements, International Planning Limited completed and submitted to the S.E.C. form ADV parts I and II. Nothing in evidence indicates that a copy of this form was ever given to Rinker.

International Planning Limited was formed for the purpose of evaluating clients' investment policies and advising them in the areas of business planning, retirement planning, insurance and employee benefits. The scope of advice included recommendations of securities in which the adviser directly or indirectly had an interest.

Rinker had been a client of Peterson's for some time and the two had been acquainted since their teen years. Rinker is an architect whose principal non-professional income is derived from real estate holdings. He relied upon Peterson for investment recommendations and had named Peterson as his personal representative under his will. Aside from the horse investment to be discussed in detail later, Rinker investments were fairly conservative consisting of money market, stocks, mutual funds,

and real estate. His total 1983 income was projected by Peterson to be $81,000.00 ($38,000.00 derived from salary and $42,600.00 from investments).

2.

In his professional capacity as a financial adviser Peterson learned from an acquaintance of an Arabian horse ranch in Visalia, California called Mainline Arabians that was experiencing financial difficulty and needed to raise two million dollars. According to the ranch's owner, Jerral Main, Peterson's name had come up as someone who had the expertise to obtain new money and markets outside the state of California. In June 1983 Peterson visited the ranch and during the fall of 1983 had numerous discussions with the ranch's owner as well as several other people concerning a possible method of getting the ranch out of debt and achieving Main's dream of purchasing a nationally ranked breeding stallion from Sweden. According to Main, Peterson was given complete information regarding the ranch's financial difficulties and had discussed them with him. The ranch had an outstanding judgment lien of $200,000.00, a drawn-upon line of credit of $500,000.00 which was in arrears, and various other judgments and debts. According to a December 1983 balance sheet, Main's total liabilities were $1,560,000.00. Assets were reported to be at the time $4,592,000.00.

Peterson, relying upon ranch information given to him by Main and others, put together a limited partnership offering which was designed to raise the cash necessary for Mainline Arabians. This partnership was called MLO. The MLO offering never closed and no units of this limited partnership were sold to anyone, including Rinker, but both Main and Peterson continued to discuss other means of acquiring a champion stallion. After the failure of the MLO offering Main, still in need of cash, went to Denver where Peterson's office was located in the latter part of January 1984 and advised Peterson he had located an outstanding stallion in Sweden that might be right for syndication and asked Peterson if there might be a way to acquire it. By this time Peterson had been to the California

ranch and felt that Main was a good horseman despite the outstanding debts. He agreed to give the matter further thought. In early February 1984, Peterson went to Sweden with Main to see the horse which he felt, after talking to several leading Swedish horse experts, was truly an outstanding stallion. From preliminary research Peterson knew how successful syndication had been achieved with other similar quality horses. Main was by this time anxious to close the transaction on the horse and told Peterson that the stallion known as Cadyk was more than he realized in terms of value and only part of its value should be put into syndication. He told Peterson that acquisition of Cadyk plus a filly El Mocca would cost $750,000.00 plus expenses of $50,000.00 but that potential breeding fees on Cadyk could run to $15,000.00 per stand. Main suggested that the horses be acquired by he and Peterson as 50/50 partners and then syndicated. Peterson agreed to consider this idea. He contacted a Denver CPA firm as well as his attorney's around the middle of February 1984. It was suggested to Peterson that the creation of two partnerships be done in order for Main and Peterson to acquire an interest in the horses without a capital contribution and avoid ordinary income. The idea was that the first partnership would buy the horses and contemporaneously with the purchase contribute the stallion to the second syndicating partnership in exchange for which the first partnership would receive a 40% interest in the syndicating partnership. The remaining 60% interest in the syndicating partnership would be held by limited partners in respect of a $1,200,000.00 cash contribution.

WPM, the purchasing partnership, was formed on March 1, 1984, with Main and Peterson as 1% general partners and also as 40% special limited partners. Harold Wright, Peterson's associate in International Planning Limited, was a 3% special limited partner, and Gary Powell was a 15% limited partner. The partnership agreement provides that in the event the horse Cadyk is not syndicated and the partnership does not have funds with which to repay Powell, the special limited partners

(Peterson and Main) would be assessed for the debt. Jerral Main and Peterson were designated as the managing general partner with full management and decision making control.

To come up with a way of raising the necessary $750,000.00, Peterson arranged a meeting in the middle part of February 1984, between Main and individuals who he felt might be interested investors. The two horses were purchased by WPM partnership for $750,000.00 on March 1, 1984, by means of an $800,000.00 loan from Gary Powell in exchange for a promissory note to him from WPM.

The syndicating limited partnership, called Cadyk Limited Partnership, was formed later on April 19, 1984, after the two horses had been cleared of U.S. quarantine and could be contributed to the syndicating partnership by WPM. Under the terms of the Cadyk partnership agreement, WPM contributed the stallion Cadyk at an agreed market value of $1,600,000.00 and the Cadyk partnership assumed the Powell note. The general partner in Cadyk Limited Partnership was WPM Limited with a 40% interest. The four limited partners in Cadyk included Powell at 15% and Rinker at 20%. Total cash contribution from the limited partners was $1,000,000.00. Rinker's limited partnership contribution consisted of $200,000.00 cash and assignment of a $200,000.00 promissory note, the details of which will be later discussed.

As finally formulated, WPM Limited Partnership wound up with a 40% interest in Cadyk Limited Partnership for no cash investment. Peterson and Main as equal WPM general partners, each had .4% interest and as special limited partners had 16% interest each. Thus, their total percentage interest in the Cadyk partnership, whose principal asset was a horse valued at $1,600,000.00 was 16.4% each. The four limited partners of Cadyk Limited Partnership retained 60% interest with Rinker's interest fixed at 20%. The partnership agreement provided that the stallion would be divided into fifty ownership interests with thirty offered for sale, the profits going to the limited partners. Profits from the eventual sale of the remaining twenty ownership interests from WPM would go to the general partner. The price was to be $80,000.00 per unit of ownership. As with WPM, the Cadyk partnership provided that Jerral Main would provide management services, receiving $400,000.00 in payment.

Although the stallion known as Cadyk was purchased and contributed by WPM to the Cadyk partnership, everything began to fall apart by the summer of 1984, if not sooner. The stallion was not shown at shows necessary for successful syndication and had not been well treated by Main's ranch where it was for a time kept. The partnership ran out of promotion money despite Peterson's efforts to secure additional financing. By the end of 1985 partnership cash was used up, Main had been fired, the stallion developed sinusitis, and Main filed for bankruptcy. Although the horse is still alive, apparently all efforts at syndication and marketing have ceased.

On March 1, 1984, Cadyk and the filly were purchased for $750,000.00 and Cadyk alone was placed in the Cadyk partnership on April 19, 1984, with a contributing value of 1.6 million dollars. A balance sheet prepared by Peterson in September 1984 listed the horse with a book value of $1,500,000.00. A balance sheet as of December 31, 1984, shows the stallion to have a value of $1,525,500.00. As of April 15, 1985, the stallion was insured for $200,000.00 but insurance of $1,200,000.00 was being sought at the time. No evidence of the horse's present value to the partnership was presented at trial and whether the interests of the Cadyk limited partners have any value at the present time is uncertain.

### 3.

Thus far the complexity of the horse acquisition, financing and Rinker's participation have only been outlined. What now follows is a recitation of the facts covering in detail Peterson's relationship with Rinker and Rinker's involvement with the horse acquisition.

As previously mentioned, Rinker had an ongoing association with Peterson stem-

ming from previous investment discussions and recommendations. This relationship existed in 1983 during the time when Peterson first became involved with Mainline Arabians and Jerral Main's cash raising needs and it continued on into 1984 when Peterson formed the WPM and Cadyk partnerships.

In January 1984 Peterson met with Rinker and told him about Mainline Arabians, of Main's hope to achieve a world class horse and then went on to tell him that an investment like this would be a good opportunity for Rinker and that he had Rinker in mind as someone who might be interested. Rinker himself had no experience in horses but his interest was further whetted when Peterson, upon returning home from his February visit to Sweden called Rinker and told him about his trip and the horse he had seen. About this time Rinker attended a meeting with Main and Peterson in Peterson's office where Main generally described for Rinker the nature of his business and the breeding program at the ranch. Main testified that while he discussed his financial difficulties in detail with Peterson and gave Peterson a financial statement, he could not recall ever personally discussing the ranch's finances with Rinker. Rinker, too, stated that Main's finances were not discussed.

Peterson thereafter proceeded to line up acquisition funds through a meeting with Powell who on February 14, 1984, indicated he was willing to loan WPM $800,000.00 necessary to acquire the horses but who indicated he did not want that much liability. Peterson told Powell that Rinker, along with several others, were interested in part of the deal. Peterson then put together a meeting with Powell and Rinker. At this meeting Peterson told Rinker that the WPM acquisition partnership was being formed with Peterson and Main as 50/50 partners in the initial acquisition by means of an $800,000.00 loan from Powell which would be, in part, guaranteed by Rinker and two others (Leonard Griffiths and Robert Sanderman). According to Peterson, the purpose of the guarantee was to reduce Powell's risk. Peterson told Rinker the horse was worth the purchase price and

that in exchange for guaranteeing Powell's note, he would be getting a limited partnership interest in WPM. Peterson, however, did not tell Rinker that, consistent with the WPM partnership agreement, he (Peterson) was personally liable for Powell's indebtedness.

On March 1, 1984, the WPM partnership was formed and Rinker, along with two others, each guaranteed $200,000.00 of Powell's line of credit. In exchange for this guarantee, Rinker received a 3.12% limited partnership interest in WPM.

The horses were purchased by WPM and placed in quarantine. Over this time period Peterson had completed several trips to Main's ranch in Visalia, California and at least by March 1, 1984, had possession of Main's balance sheet and had been fully advised by Main of the extent of the ranch's financial problems but did not discuss the balance sheet with Rinker. Peterson, however, testified that he did discuss with Rinker the $200,000.00 judgment as well as a line of credit arrearage due W. E. Heller prior to Rinker investing any money. Rinker, on the other hand, denies any specific discussions taking place prior to his cash investment. Rinker's recollection is buttressed by the testimony of his co-guarantor and Cadyk partnership investor, Mr. Sanderman, who stated that prior to becoming a Cadyk limited partner in April, he had been told nothing of Main's financial condition. Lacking detailed information, Rinker relied upon Peterson who consistently told him he was handling and overseeing all the financial arrangements and that everything was under his control.

During this time Main was under pressure from his creditors and needed immediate cash in advance of the Cadyk partnership formation. He told Peterson his short term cash flow needs were critical and that he wanted an advance on his Cadyk partnership management fee. Originally Peterson had not envisioned any cash going to Main until the Cadyk partnersip had been funded but due to his persistence, plans were altered. On March 6, 1984, Peterson spoke to Rinker about Main's immediate cash needs telling him it would be neces-

sary to make an immediate cash infusion. Rinker in a general way was told that Main had financial matters that needed restructuring but was assured by Peterson that everything was still okay. Main asked Peterson if he could approach Rinker directly about a loan and Peterson advised Main that it would be alright. In fact, Peterson asked him to write a letter to Rinker explaining the terms of the loan and the proposed use of the funds. Peterson himself was the one who wrote a six page letter memorandum setting forth the terms of a $400,000.00 loan from Rinker to Main whereby, in exchange for a one-year loan in the sum of $400,000.00, Main would give Rinker a promissory note bearing an interest rate of 16% secured by a quit claim deed of trust in the ranch. The letter provided the funds would be used entirely for the betterment and productivity of the stallion Cadyk including facility improvement, additional labor, debt payment, advertising and promotion.

When Rinker received the letter, he was not sure what it was for and asked Peterson who advised him to ignore it but who went on to say that there was a need for immediate cash infusion before the horses arrived at the ranch. Peterson recommended that Rinker loan Main $200,000.00, but according to Peterson there was no understanding how much Rinker would actually loan Main. Peterson did not discuss either the note or its terms with Rinker. He told Rinker that any money lent Main would be a personal loan to Main and that he (Peterson) had no control over it but that any amount actually loaned could be regarded as a contribution to the syndicating partnership by means of Rinker contributing his note from Main to the Cadyk partnership once it was formed. In furtherance of this arrangement, Main signed a note in the sum of $400,000.00 payable to Rinker and a deed of trust for the ranch was prepared and signed securing both Rinker's loan as well as Powell's. Peterson said when he advised Rinker to make the loan he had reviewed Main's financial condition. He did not, however, check for liens against the ranch or discuss Main's balance sheet with Rinker.

The only source Rinker had for the Main loan funds was to tap the equity in his real estate holdings. Peterson prepared a financial statement for Rinker and suggested that Rinker obtain a loan from the South Denver National Bank. Rinker signed the financial statement as requested by Peterson on February 22, 1984, and Peterson then took it to the bank and arranged for a $400,000.00 loan from the bank to Rinker. All loan negotiations with the bank were made by Peterson and Rinker relied on Peterson to handle whatever had to be done. Rinker believed his deal with Main was his way of investing in the Cadyk partnership and never regarded it as a loan. He relied upon Peterson to direct the deal, believing from Peterson's comments over the previous month or so that any loan would be short-term and that he would have his money back in a short period of time through syndication stud fees.

All bank loan documents were ready for a March 8, 1984 closing. When Rinker appeared at the bank he was given a $200,000.00 check and told by Peterson to endorse it. Going into the deal, Rinker thought the money would be put into a draw account to be drawn upon by Main as needed for support of the horse. He was surprised upon learning the entire $200,000.00 was to be immediately turned over to Main. Although the letter as well as the note from Main state the loan to be in the amount of $400,000.00, only $200,000.00 was involved with no one able to explain why the note from Main to Rinker was drawn for $400,000.00. As Rinker understood it, $200,000.00 of his $400,000.00 bank loan was to be held as a guarantee for the Powell note and the other $200,000.00 was to go into a draw account for Main. Rinker believed the $200,000.00 would be the extent of his partnership participation.

The $400,000.00 bank loan was made to Rinker secured by a seven-unit apartment building which was up to this time essentially debt free. Upon Rinker signing the $200,000.00 check, Peterson took possession of it and personally sent it to Main who used it, as best as anyone can deter-

mine, to pay down outstanding judgments, satisfy an SBA guaranteed loan and purchase a vehicle. No accounting of the $200,000.00 was ever made by Main and, except for an incomplete partnership report prepared after the fact, Peterson cannot fully account for the uses to which the $200,000.00 was put. Peterson conceded that none of the money was used for the horses themselves except as incidental to funds expended in general ranch operations.

At the March 8, 1984 closing, Rinker knew generally that Main had some financial difficulties but did not understand the $200,000.00 would be used to satisfy or partially satisfy existing ranch creditors.

On April 12, 1984 Rinker, becoming extremely nervous over his investment, wrote Peterson a letter wherein he asked for detailed information on the investment including future projections. He also stated that when he entered into the venture he did not know the ranch was on shaky financial ground or that the $200,000.00 would be used to pay off ranch debts unassociated with the stallion. In response, Peterson discussed costs and expenses with Rinker and said he would provide a projection. Rinker was told further by Peterson that Main had received the funds, the creditor situation had been taken care of and that the two horses were doing well. Rinker was told that even if all syndication units did not sell, some would and the partnership would perform at least well enough to pay off his bank loan. Peterson told Rinker that the Cadyk syndicating partnership had yet to be formed and asked Rinker if he still wanted in. Rinker wound up staying in but by this time he knew the financial problems facing Main and the fact of the outstanding judgments and Main's defaulted line of credit. Nonetheless, he went ahead and when Cadyk limited partnership was formed on April 19, 1984, he contributed the $200,000.00 Main note as well as an additional $200,000.00 cash. The cash contribution came from the $200,-000.00 balance of his $400,000.00 bank loan which had been held on the Powell guarantee. When Powell cancelled his note, Rinker directed the bank to send the $200,-

000.00 to the Cadyk partnership. Thus, for a total contribution of $400,000.00 in cash, Rinker wound up with a 20% interest in Cadyk and WPM as general partner (comprised of Peterson and Main) wound up with a 40% interest for no capital contribution. Rinker's hopes for profit from his investment were never realized. His security in the ranch was left unperfected because neither Peterson nor anyone else followed through with recording the deed of trust and it remained unrecorded. Consequently, Rinker wound up as an unsecured creditor in the Jerral Main bankruptcy. Peterson at all times glowingly represented the horse deal as an approprite investment for Rinker and strongly encouraged Rinker's investment, advising him on various occasions that it was a good deal. This advice, despite a statement on page four of form ADV part II that International Planning Limited does not analyze or recommend securities. However, in answer to question 9(d) on page 7 of form ADV part II, it is indicated that the company does recommend the purchase of securities in which the investment adviser has an interest, further explaining in schedule F thereof:

> International Planning Limited executives receive commissions from the sale of product or investments to a client. In order to minimize conflict of interest—all recommendations generic in nature and do not contain reference to a specific product. Clients are encouraged to work closely with all of his advisors to include his attorney, his accountant, or other insurance advisors and his stock broker. All final decisions are made by the client.

### Conclusions of Law

#### 1.

The plaintiff's principal argument for nondischargeability is founded upon Peterson's status as a financial adviser; the argument being, that the duties and responsibilities imposed upon a financial adviser by the Investment Advisers Act of 1940 (15 U.S.C. § 80b–1) creates an express trust relationship commensurate with section 523(a)(4) of the Bankruptcy Code and

that his conduct during the horse investment negotiations and arrangements constituted fraud or defalcation.

Section 523(a)(4) of the Bankruptcy Code provides, as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

\* \* \* \* \* \*

11 U.S.C. § 523(a)(4). The fraud or defalcation which is covered under section 523(a)(4) is a broad category of conduct and is more encompassing than either embezzlement or misappropriation. Before discussing further the definition of defalcation in the context of section 523(a)(4) or in the context of the facts of this case, it is first necessary to determine whether Peterson was ever acting in a fiduciary capacity. Only then does the question arise of whether the loss complained of resulted from his defalcation.

 Courts have tempered the loose definition of defalcation under section 523(a)(4) by imposing a strict interpretation of the fiduciary obligations covered by the section. This court has previously indicated that the traditional definition of fiduciary—a relationship involving confidence, trust and good faith, is inapplicable. *In re Anzman*, 73 B.R. 156 (Bankr.Colo.1986); *In re Currin*, 55 B.R. 928 (Bankr.Colo. 1985); *In re Wade*, 43 B.R. 976 (Bankr. Colo.1984). Implied or constructive trusts and trusts ex malificio, that is, trusts imposed because of wrong doing on the part of a person to be charged as a trustee, are not sufficient. For a debt to be nondischargeable under section 523(a)(4) there must have been an express trust in existence prior to or independent from the alleged act or wrongdoing and there must be a res or particular property entrusted to the fiduciary for the benefit of another. *See generally, Davis v. Aetna Acceptance*

Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Wade, supra*, at p. 983. In the Tenth Circuit case of *In re Romero*, 535 F.2d 618 (10th Cir.1976) the requisite fiduciary relationship consistent with the requirements of *Davis, supra*, was found to exist by virtue of a New Mexico state law governing general construction contractors. The law in question provided for the revocation of a contractor's license if the contractor had diverted funds from the project for which they were intended. "In our view", said the court, "section 67–35–26 [of the New Mexico statutes annotated] clearly imposes a fiduciary duty upon contractors who have been advanced money pursuant to construction contracts". Such contractors upon being advanced funds are under a duty to apply them to the project for which they were advanced. *Romero*, although soundly criticized by other courts [1] is still the law in this circuit. Although *Romero* held that a statutory licensing requirement may impose a fiduciary duty within the meaning of section 523(a)(4), the case did not depart from the elements prerequisite to the existence of a fiduciary duty. What *Romero* said was that those elements may spring from a statutorily imposed duty. Even under *Romero*, the fiduciary duty must spring from an express or technical trust in existence before the creation of the debt in controversy. As Judge Clark noted in the case of *In re Anzman, supra*, at 166, although the requisite fiduciary status may spring from a statute, not every statute imposes the requisite trust obligations. For a statute to meet the requisite elements it must first impose a licensing requirement providing for revocation if statutory requirements are not followed. Secondly, it must be concerned with expressly designated funds (in *Romero* they were funds advanced for contract completion) and finally, the statute by unambiguous language must require the performance of affirmative duties in managing the funds held in "trust" and clearly set forth the

**1.** *In re Pedrazzini*, 644 F.2d 756 (9th Cir.1981); *Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980);

*In re Kelley*, 84 B.R. 225 (Bankr.M.D.Fla.1988).

trust requirements. *Anzman* was concerned with several Colorado statutory provisions governing the activities of corporate officers. Judge Clark held that these provisions did not give rise to a fiduciary relationship because the sections involved did not expressly designate funds received by a corporation as trust funds, imposed no specific duties for fund segregation and did not provide for a licensing scheme providing for revocation if the statute requirements were not followed.

The statute relied upon in the instant case is the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 through 80b–21. As an investment adviser registered with the Security and Exchange Commission, Peterson, during the time he was promoting the horse investment and setting up the limited partnerships, was under an obligation to comply with the Investment Advisers Act as well as the rules and regulations promulgated thereunder as enumerated in 17 C.F.R. § 275.0–2 to section 275.-206(4)–3. Peterson charges that the Act contains no language creating a trust, that it fails to identify a trust res, and that it creates no affirmative duties or responsibilities.

The Supreme Court in the 1963 case of *Securities & E. Com'n. v. Capital Gains Research Bur.*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), said the fundamental purpose of the Act was to eliminate abuses in the industry and substitute a requirement of full disclosure for the philosophy of caveat emptor. The Act was meant to serve as a proscription against any practice that operates as a fraud or deceit upon a client and eliminate conflicts of interest. The enactment followed an S.E.C. study that revealed an attitude that investment advisers could not "completely perform

their basic function—furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments—unless all conflicts of interest between the investment counsel and the client were removed". 375 U.S. at 186–89, 84 S.Ct. at 280–81. The court said in sum, the Act reflects a congressional recognition "of the delicate fiduciary nature of an investment advisory relationship". 375 U.S. at 191, 84 S.Ct. at 282–83. In later cases the Supreme Court again reiterated that the Act establishes enforceable federal fiduciary standards to govern the conduct of investment advisers. *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).[2] Beyond this statement, the Supreme Court does not clarify whether the reference is to an express trust or merely an implied trust arising by virtue of the duty of confidence and good faith imposed upon an investment adviser. The reference to "federal fiduciary standard" is unclear and notwithstanding that phrase, this court believes that for the statute to create a fiduciary relationship consistent with *Davis, supra*, it must, within its language meet the prerequisite elements enunciated in *Romero* and *Anzman, supra*. It must (1) impose a revocable licensing requirement, (2) be concerned with expressly designated funds and (3) must require the performance of affirmative fund management duties.

The Act itself in section 80b–6 thereof broadly proscribes certain transactions by

---

**2.** Peterson argues that the Act, while it prohibits certain conduct on the part of an investment adviser, creates only a limited private remedy and does not include the recovery of damages, citing *Transamerica Mortgage Advisers v. Lewis, supra*. There being no damages available to the plaintiff, ergo there can be no "debt" under the Bankruptcy Code. The plaintiff agrees but says that does not affect the common law cause of action held by Rinker. This court, within the context of this opinion, does not intend to give

an opinion on this issue finding it appropriate to leave the question of available remedies to the United States District Court for the District of Colorado and the Colorado State District Court before whom the liability cases are venued and, presumably, by now resolved. To the extent those cases resulted in a judgment for the plaintiff, that judgment would constitute a debt within the purview of section 523 and section 101(11) of the Bankruptcy Code.

an investment adviser including: (1) any direct or indirect scheme to defraud a client; (2) any transaction, purchase or course of business dealing that operates as a fraud or deceit upon a client; (3) acting as principal for his own account, knowingly effecting a purchase for a client without disclosing in writing before completion the capacity in which he is acting and obtaining client consent; (4) engaging in any act, practice or course of business that is fraudulent, deceptive or manipulative as defined by the regulations promulgated in 17 C.F.R. § 275.0–2 et seq.

17 C.F.R. § 275.204–2 mandates that an investment adviser keep accurate and current records of all cash receipts and disbursements including any general and auxiliary ledgers as well as originals of all written communications.

Section 275.204–3 requires an investment adviser to provide a client with a written disclosure forty-eight hours in advance of entering into any contract. This disclosure is minimally to conform to part II of form ADV.

Under 17 C.F.R. § 275.206(4)–2 it is a fraudulent, deceptive or a manipulative act for any investment adviser in possession of client funds to take any action *directly* or *indirectly* unless the client's funds are deposited in a segregated bank account, the client being notified of the place and manner in which the funds will be maintained and separate detailed records of any withdrawals are maintained.

Any act or practice constituting a violation of the Act or regulations promulgated thereunder, may result in criminal proceedings, 15 U.S.C. § 80b–17; injunctive relief, 15 U.S.C. § 80b–9(e); avoidance of any contract made thereunder, 15 U.S.C. § 80b–15; and, may result in revocation of the investment adviser's S.E.C. registration, 15 U.S. C. § 80b–3(e).

The foregoing statutory requirements attendant to one's status as an investment adviser do set forth the three prerequisite elements necessary for a statutorily created fiduciary relationship. First of all, there is a very definite revocable license requirement. Secondly, there is a direct reference in 17 C.F.R. § 275.206(4)–2 to control of designated funds and an implied reference in section 80b–6 of the Act itself to a general duty to handle client funds in a way free from any scheme to defraud. The import of 17 C.F.R. § 275.206(4)–2 as well as section 275.204–2 is that client funds never lose that character merely because an investment adviser, whether by direct or indirect means, takes possession of them. The funds are always entrusted to an investment adviser to manage and control in a fashion consistent with the Act and its regulations. Any funds coming into an investment adviser's hands directly or indirectly form the res or particular property of the trust. Peterson's argument that the transfer of $200,000.00 of Rinker's money to Main was nothing more than a loan over which he had no responsibility or control is belied by the circumstances surrounding the loan. Peterson was active in the promotion and solicitation of the $200,000.00 "loan" from Rinker to Main and thus, while he would like now to be regarded as one not involved, he cannot; for, Rinker did not even know Main before Peterson introduced them and acquisition of a stallion was pictured by Peterson as a rosy money maker. The agreement between Rinker and Main would never have occurred had it not been for Peterson's careful caressing of Rinker. The $200,-000.00 advance, while evidenced by a note and deed of trust was actually, as Peterson testified, a vehicle for Rinker to acquire an interest in the Cadyk Limited Partnership. Peterson, however indirectly the arrangement was, did take possession of the $200,-000.00 through his active promotion of the partnership and his disarming encouragement of Rinker to the effect that $200,-000.00 would be necessary to get the ranch ready.

Finally, the Act and regulations set forth a prescribed method for the management, control and accounting of all client funds.

■ This court believes, consistent with *Romero* and its Colorado progeny that the Investment Advisers Act of 1940 imposes upon an investment adviser statutory obligations and duties which rise to the level of

fiduciary responsibilities within the meaning set forth by *Davis, supra.*

The federal statutory language discussed above and which this court believes creates a section 523(a)(4) fiduciary status is quite different from the statutes reviewed in *In re Anzman* and which were found to lack the characteristics of an express trust. C.R.S. § 7–5–110 and 114(1)(c) contained no licensing scheme, no fund segregation responsibility and nothing suggesting that corporate dividends declared by a board of directors were to be held in trust. *Anzman,* 73 B.R. at 166–67. In the instant case we are concerned with money that in the first instance belonged to the client, not the investment adviser and, which for whatever reason was turned over to the adviser at his recommendation.

2.

■ Having concluded that Peterson's relationship with Rinker was that of a fiduciary, we now turn to the question of whether he engaged in acts constituting a defalcation.

The term has not been precisely defined in section 523(a)(4) but in the courts it has been said to be a concept requiring an objective standard with no element of intent or bad faith necessary. It may even cover innocent defaults. *Carey Lumber Co. v. Bell,* 615 F.2d 370, 376 (5th Cir.1980). It has also been defined as the failure to account for money or property of another. *In re Twitchell,* 72 B.R. 431 (Bankr. Utah 1987); *In re Waters,* 20 B.R. 277 (Bankr.W. D.Tex.1982). In the case of *In re Cowley,* 35 B.R. 526, 529 (Bankr.Kan.1983), it was said to be the "slightest misconduct, and may not involve misconduct at all".

Rinker entered into the horse investment with no independent knowledge of horses, trusting that Peterson as his friend and financial adviser would faithfully guide him to an appropriate investment and take care of any necessary financial details. Peterson, on the other hand, engaged in the horse investment discussions with Rinker at a time when he had already had previous discussions with Main about a 50/50 ownership proposition and methods of acquiring the necessary cash to acquire the horse without any personal cash outlay. From the inception of his talks with Rinker, Peterson was an interested party and his recommendation of the horse as an investment was doubtless colored by his own visions of personal gain. His recommendation of it as an appropriate investment device for Rinker was by no means a generic recommendation as set out in schedule F of disclosure form ADV part II but instead and again contrary to the disclosure, was a specific product recommendation. Moreover, a product in which Peterson himself had a stake.

Rinker's natural tendency towards caution was completely disarmed by Peterson's rush to persistence in acquiring the horse, getting Main the cash and creating the partnership—all within several months. During this time Rinker's caution was anesthetized by his longstanding faith in Peterson and Peterson's repeated assurances that he would take care of everything. Indeed, he did take care of everything. He put together the partnership offerings, lined up the investors and located a source of immediate financing for Main—namely Rinker. Rinker had little to do with his own bank loan or the loan to Main except to sign a financial statement prepared by Peterson and attend a loan closing arranged by Peterson where everything had been arranged beforehand. He signed the $200,000.00 check and handed it over to Peterson. Any reluctance or confusion on his part at this point was laid aside by Peterson's assurances that everything was being appropriately taken care of. This was hardly objective or disinterested advice given the fact that Main had considerable financial problems so immediate that he had to have substantial cash sums just to protect the very ranch where the horses were to be kept. At this juncture, it would seem a prudent and disinterested adviser would step back from the deal with Main and consider whether it was an appropriate situation for someone who had income of only $81,000.00 per year.

Rinker's involvement went forward without what can be regarded as objective advice from Peterson but with advice which

was at variance with duties statutorily mandated of an investment adviser. No written disclosure was provided Rinker in advance of his financial involvement with Main nor was he ever informed that by guaranting the Powell note, his investment adviser was being let off the hook. The transaction both between Rinker and Powell and Rinker and Main were engineered by Peterson as a way to protect the original scheme whereby he and Main would obtain 40% asset ownership without any cash outlay. Rinker was never given the information with which to make an informed investment decision because the very person upon whom he was relying on for that information was essentially acting as a principal for his own interests and not those of his client.

Once Rinker's $200,000.00 had been sent on by Peterson to his partner Main, Rinker never received an accounting of any kind until all the money was spent again in violation of the statutory responsibilities. Peterson was never able to fully account for the expenditure of these funds by his partner Main.

Looking at the facts overall, they suggest to this court that Peterson, rather than providing Rinker with competent, unbiased advice concerning the sound management of his money, was instead engaged in a device or scheme to acquire an investment property himself for no cash outlay. This purpose after all was the objective in setting up two partnerships in the first place. Rinker was involved because he was naive, trusting and had unencumbered assets. Peterson's recommendation that Rinker make the investment seems to have been made with his own best interests in mind not those of Rinker.

In sum, this court views the transaction as put together by Peterson and which resulted in the losses for which state and federal court actions were commenced to be contrary to the Investment Advisers Act of 1940 and constituted a defalcation while acting in a fiduciary capacity pursuant to section 523(a)(4) of the United States Bankruptcy Code. Having decided the issue of nondischargeability in the context of section 523(a)(4) it is not necessary to the result to determine whether relief might also be available under section 523(a)(2)(A).

Any judgment recovered by Rinker as a result of the lawsuits commenced in Colorado State Court (Civil action No. 85CV8039) or in the Federal District Court for the District of Colorado (Civil action No. 85F1675) are nondischargeable under section 523(a)(4) of the United States Bankruptcy Code.

JUDGMENT MAY BE ENTERED ACCORDINGLY.

SO ORDERED.

## AMENDED ORDER FOR JUDGMENT

On October 7, 1988, the above-named plaintiff, Ronald E. Rinker or his assigns, as prevailing party in the above-captioned case, asked this court for an order clarifying its Memorandum and Order entered September 23, 1988, to reflect the current status of Colorado State Civil Action No. 85 CV 8039 and Colorado Federal District Court Civil Action No. 85 F 1675, both of which were dismissed without prejudice in 1987.

By virtue of such dismissal, reference in the memorandum order to those actions as a basis for the defendant's liability was inadvertent. It was the sense of the determination of nondischargeability under section 523(a)(4) that any debt created by reason of a judgment rendered in an appropriate state or federal forum in favor of the plaintiff and against the defendant would be regarded as nondischargeable in bankruptcy.

Accordingly, IT IS ORDERED that the judgment emanating from this court's Memorandum and Order of September 23, 1988, be amended as follows:

Any judgment recovered in any forum with appropriate jurisdiction by Ronald E. Rinker or his assigns against James I. Peterson stemming from the circumstances giving rise to the instant adversary proceeding is nondischargeable under section 523(a)(4) of the United States Bankruptcy Code for the reasons discussed.

LET JUDGMENT BE ENTERED ACCORDINGLY.