In re Walter Alan WOODS, Debtor.

Richard L. Cundy, M.D., et al.,
Appellees/Plaintiffs,

v.

Walter Alan Woods,
Appellant/Defendant.

Civ.A. No. 94–WM–2627.
Adversary No. 93–1509 SBB.

United States District Court,
D. Colorado.

Jan. 5, 2001.

Peggy J. Anderson, Dufford & Brown, P.C., Denver, CO, for plaintiffs.

Richard W. Breithaupt, Barbara R. Woods, Woods, Kinney & Breithaupt, P.C., Englewood, CO, Paul G. Quinn, Nicholls & Associates, P.C., F. Kelly Smith, F. Kelly Smith, Attorney at Law, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

MILLER, District Judge.

This is an appeal by Walter Alan Woods, debtor/defendant (Woods or Defendant), of Bankruptcy Judge Sidney B. Brooks' decision in adversary proceeding number 93–1509 SBB. Judge Brooks concluded that a debt of $58,276 was not dischargeable pursuant to 11 U.S.C. § 523(a)(4). In this appeal, Woods asserts that it was legal and factual error to conclude he was acting in a fiduciary capacity or that he committed a

defalcation as those terms are applied by § 523(a)(4).

## Standard of Review

 The district court functions as an appellate court and is authorized to affirm, reverse, modify or remand the bankruptcy court's ruling. Bankr.R. 8013. I may set aside the bankruptcy court's findings of fact only if they are clearly erroneous. *In re Blehm Land & Cattle Co.*, 859 F.2d 137, 138 (10th Cir.1988). Its conclusions of law, however, are subject to *de novo* review. *Id.* Mixed questions of fact and law involving primarily legal issues are reviewed *de novo;* mixed questions involving primarily factual considerations are reviewed under the clearly erroneous standard. *In re Wes Dor Inc.*, 996 F.2d 237 (10th Cir.1993). Legal conclusions drawn from facts are reviewed *de novo. In re Golf Course Builders Leasing, Inc.*, 768 F.2d 1167, 1169 (10th Cir.1985).

## Background

The parties to this appeal were investors who sought to construct three office buildings in Arapahoe County, Colorado. In the early 1980's they entered into a joint venture agreement (Agreement) and created a limited liability company, Merham, to secure funding for, and otherwise manage, the project. Under the terms of the Agreement, Merham's management committee had to receive authorization from a majority of the investors before it could allow Merham to borrow funds.

The project had proceeded with construction of the first building (sometimes referred to as Phase I) with construction financing provided by University National Bank. On September 1, 1983, the investors executed a borrowing resolution that authorized their management committee to borrow up to $2.5 million from Platte Valley Savings and Loan Association (Platte Valley) to pay off the Phase I construction loan and provide permanent financing. Exhibit 18. As part of that resolution, each investor agreed to remain jointly and severally liable for such a loan. On October 12, 1983, Platte Valley committed to a permanent loan of $2.475 million (the Platte Valley loan). Exhibit 21. Sometime thereafter, the investors executed a second borrowing resolution specifically authorizing the Platte Valley loan. Exhibit 20. The bankruptcy court's conclusion to the contrary, namely that the loan "was ostensibly borrowed so Merham could proceed with building the second building," [1] is clearly erroneous. The parties agree that the purpose of the Platte Valley loan was for the first building, not the second. Appellant's Opening Brief, Page 13; Appellee's Opening Brief, Page 5.

In October 1983, the venturers executed a distinct borrowing authorization empowering the management committee to borrow funds for a second building (Phase II), including the payoff of liabilities on the land where the building was to be constructed. Specifically, the resolution provided authority to the management committee:

> to borrow, obligate, contract, encumber, etc. for the Joint Venture for the purpose of constructing a 3–story Dayton Plaza Office Building Phase II (30,770 square feet). I furthermore authorize the Management Committee to borrow, obligate, contract, etc. funds on behalf of the Joint Venture for the purpose of satisfying an installment liability on the land in which improvements shall be constructed.

> The intent of this authorization is to allow for the expeditious handling of all matters in the normal course of con-

---

1. Finding No. 5, *In re Woods,* 175 B.R. 78, 80 (Bankr.D.Colo.1994).

structing a building and in the refinance of a land loan. Exhibit 19.

Plainly, these resolutions pertain to distinct aspects of the project. On the one hand, the $2.475 million dollar resolutions (Exhibits 18 and 20) covered permanent financing of the existing structure, namely the first building or Phase I. On the other hand, the resolution found in Exhibit 19 concerns the second building or Phase II. As appellant points out, this authorization for the second building was pursuant to a previous decision by the venturers to select Option III of its financing options set out in Exhibit 11: pay off the first building's construction loan and the land loan; obtain a construction loan for the second building; and, upon conditions, proceed with construction of the third building. Exhibit 11. Appellees do not dispute that was the purpose of the Exhibit 19, although they do argue there existed preconditions on construction. Appellee's Opening Brief, pp. 6–7.

The bankruptcy court's findings with regard to Exhibit 19 do not make this clear distinction and indeed seem to treat all three resolutions as covering the same transaction. For example, Finding 17 states that "Exhibit 19 did not authorize Defendant or other members of the Management Committee to (a) borrow money from Fox Ranches, Inc. or (b) exceed the $2,500,000.00 loan authorization or limitation." Finding No. 17, *In re Woods*, 175 B.R. at 81. Exhibit 19 did not concern the authorization to borrow $2.5 million from Platte Valley, and there is nothing in Exhibit 19 to suggest that it was in any way tied to that loan amount. With regard to authority to borrow from Fox Ranches (see below), the plain language of Exhibit 19 permitted the management committee

to borrow from any source. It was clear error to engraft those limitations upon the Exhibit 19 resolution. Indeed, the Exhibit 19 resolution would be virtually meaningless if it were limited to the terms of the Platte Valley loan authorization.

Similarly, the bankruptcy court defined the "*res*," or the property entrusted to Woods, as "a bundle of rights and authorizations to act for and on behalf of the joint venturers, and to commit Merham and each venturer to finance and build a real estate project, specifically Phase 2, or Building 2 of a three-building project." Finding No. 24, *In re Woods*, 175 B.R. at 82. Again, if Exhibit 19, which concerns Phase II, is the *res* to which the court refers, there is no limitation on the amount of the loan or on who may qualify as lenders. However, the court's conclusions with regard to defalcations concerning that *res* are tied to the $2.5 million dollar limitation and other matters, again indicating that the court erroneously superimposed the limitations of the permanent loan resolutions for the first building (Exhibits 18 and 20) upon the distinct resolution for the second building (Exhibit 19).

Returning to the Platte Valley loan, when the management committee prepared to close on the loan, it discovered that the loan would be insufficient to pay off a previous loan from Otero Savings and Loan (Otero) that was secured by the parcel of land upon which the second building was to be constructed. Consequently, Platte Valley extended the closing to afford Merham an opportunity to resolve the situation.

During the extension, management committee member Thomas Denham negotiated a $53,000 insider loan[2] from Fox Ranches, Inc. (the Fox Ranch loan), which, when combined with the proceeds from the

---

2. Mr. Denham's wife was an owner of Fox Ranches.

Platte Valley loan, was sufficient to satisfy the obligation to Otero and release the lien on the underlying parcel to allow the venture to proceed with Phase II.[3] The loan was unsecured, with interest at 14%, only .125 of 1% above the rate for the secured loan from Platte Valley, and the terms were patently reasonable for the time and circumstances. *See In re Woods,* 175 B.R. at 80. The management committee failed to seek a prior authorization for the Fox Ranch loan from the investors separate from the Exhibit 19 authorization which the committee may have assumed was adequate.

The Platte Valley and Fox Ranch loans closed simultaneously, and the proceeds were used, in part, to satisfy the obligation to Otero. At closing, Woods, an attorney, acted as counsel for Merham and the investors in this transaction, in addition to his role as a joint venturer and member of the management committee. He and the other members of the management committee approved and executed the notes for both loans.

The joint venture repaid the Fox Ranch loan in July 1984 (the payoff was $58,276), by means of a subsequent construction loan for the second building. The venture also completed the construction of the third building (Phase III), again consistent with the venture's decision to proceed in accordance with Option III set out in Exhibit 11. The venture ultimately obtained permanent financing for the second and third buildings in the amount of $4,503,500 from Pacific Pioneer Financial Corporation (the Pacific loan).[4] The investors were personally liable for the Pacific loan.

The joint venture eventually defaulted on the Pacific loan. Foreclosure did not completely satisfy the debt, leaving the venturers liable for the deficiency. Appellees, along with three other members of the joint venture, paid $887,550 to settle the debt. Woods, however, filed for bankruptcy and did not contribute to the settlement.

The appellees brought this adversary proceeding in Woods' bankruptcy to prevent the discharge of any debts resulting from the joint venture's default. The bankruptcy court agreed that the $58,276 attributable to the Fox loan was not dischargeable pursuant to 11 U.S.C. § 523(a)(4), concluding that Woods owed a fiduciary duty to the appellees stemming from his role as co-venturer, management committee member, and attorney to the joint venture. The court then found that Woods committed a defalcation of his fiduciary duties when he obligated the joint venture to loan amounts in excess of one or more particular borrowing authorizations. Woods challenges both conclusions with this appeal.

### Discussion

Section 523(a) of the Bankruptcy Code states, in relevant part, that: "A discharge under section 727 ... of this

---

3. The court found that the Platte Valley loan could have been closed without the Fox loan by leaving the Phase II tract unreleased. 175 B.R. at 82. The defendant disputes this conclusion and claims it is not supported by the record (Appellant's Opening Brief, p. 34, FN. 18). The court does not cite to any part of the record to support this conclusion, yet the defendant also fails to direct me to any evidence which would rule out this conclusion. Without deciding the issue, I only observe that the failure to obtain the release of the parcel for the second building would be inconsistent with venture's declared intent to proceed with its construction.

4. I note that the appellees point to nothing in the record which indicates that the plaintiffs or any other member of the venture ever objected, prior to this case, to the Fox Ranch loan or to its subsequent payoff by construction and permanent loan financing.

title does not discharge an individual debtor from any debt ... for ... defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). Therefore, "a finding of nondischargeability under section 523(a)(4) requires a showing of (1) the existence of a fiduciary relationship between the debtor and the objecting party, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship." *In re Storie,* 216 B.R. 283, 285 (10th Cir. BAP 1997). Appellees had the burden of proof to establish these elements by a preponderance of the evidence. *In re Seay,* 215 B.R. 780 (10th Cir. BAP 1997).

■ Further, "exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *In re Kaspar,* 125 F.3d 1358, 1361 (10th Cir.1997).

Accordingly, the issues to be decided are whether, given this narrow construction, appellees proved the existence of a § 523(a)(4) fiduciary relationship and, if so, a defalcation of those fiduciary duties. I address those issues sequentially.

1. *Fiduciary Duty*

■ For a fiduciary relationship to exist under § 523(a)(4), there must be an express or technical trust. *In re Young,* 91 F.3d 1367, 1371 (10th Cir.1996). The bankruptcy court did not find, and appellees do not assert, the existence of any express trust, but the court concluded that a technical trust was created because the defendant acted as a joint venturer, management committee member, and attorney at the closing of the Platte Valley and Fox Ranch loans. *In re Woods,* 175 B.R. at 84. A technical trust may arise as a result of defined obligations imposed upon the debtor by state or federal statute. *See, e.g., In re Romero,* 535 F.2d 618, 622 (10th Cir. 1976) (general contractor held under New Mexico statutes to act in a fiduciary capacity with regard to funds advanced by the owner for payment of subcontractors and suppliers).

■ On the other hand, a general fiduciary duty arising out of a relationship does not suffice: "Neither a general fiduciary duty of confidence, trust, loyalty, in good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability." *Young,* 91 F.3d at 1372. With regard to an attorney's duties to his client, the law requires "more than an attorney-client relationship alone to establish a fiduciary relationship for purposes of § 523(a)(4)." *Id.* at 1371.

■ To the same effect, the generic duties of trust and confidence owed by partners or joint venturers do not create a § 523(a)(4) fiduciary relationship. *In re Schwenn,* 126 B.R. 351, 353 (D.Colo.1991) (Uniform Partnership Act does not create a technical trust). To the extent there may have been uncertainty whether such generic relational duties give rise to a § 523(a)(4) fiduciary relationship, *In re Young* has determined that such relationships do not. *In re Seay,* 215 B.R. at 786–787 (interpreting the court's opinion in this case to conclude that the fiduciary duty arose simply from the defendant's status as a joint venturer).

■ The bankruptcy court expressly held that Woods acted in a § 523(a)(4) fiduciary capacity solely because he was a joint venturer, management committee member and attorney. 175 B.R. at 84. Other findings appear to confirm that the court relied on general duties arising from the professional or business relationships rather than the mandates of specific stat-

utes or rules.[5] Neither the court nor the appellees cite any rule, statute or other authority that would permit such general fiduciary duties, without more, to constitute a technical trust. I conclude it was legal error to find a technical trust on those bases alone. *In re Young,* 91 F.3d at 1372 (existence of fiduciary duty under § 523(a)(4) is a legal, rather than a factual, finding).

Appellees attempt to support the bankruptcy court's decision by urging a technical trust arose from applicable attorney disciplinary rules, citing *In re Janikowski,* 60 B.R. 784, 788 (Bankr.N.D.Ill.1986). In particular, appellees point to D.R. 9–102 of the Colorado Code of Professional Responsibility, in force at the relevant time, which provides that "all funds of clients paid to a lawyer" shall be maintained in accounts separate from the fund of the lawyer with certain exceptions and that the lawyer must "properly notify a client of receipt of its funds, securities or properties." D.R. 9–102(A), (B)(1). Without resolving whether the *res* involved here would be governed by this disciplinary rule,[6] I conclude that this argument misses the mark. The *res* as defined by the court, the borrowing resolutions or authorizations for the Phase II loans, was given to all members of the management committee and not solely to Woods as the venturers' lawyer to be held by him in trust for the venture. Accordingly, appellees' argument based on disciplinary rules is unavailing.

 The law of this circuit is that, before I can conclude a § 523(a)(4) fiducia-ry relationship exists, I *"must* find that the money or property on which the debt at issue was based was entrusted to the debtor." *In re Young,* 91 F.3d at 1370 (emphasis added). This law rests on the basic responsibility of the trustee for the trust property or *res;* without a *res* there could be no technical trust. *See In re Seay,* 215 B.R. at 787; *In re Evans,* 161 B.R. 474, 477 (9th Cir. BAP 1993) (cited with approval in *Young);* Restatement 2nd of Trusts, § 74 (1959). Accordingly, professional or commercial relationships which are not by themselves adequate to impose § 523(a)(4) fiduciary status can ripen into such status by the entrustment of property to the venturer. *In re Kudla,* 105 B.R. 985, 990 (Bankr.D.Colo.1989) (deposit in an attorney's trust account); *In re Currin,* 55 B.R. 928, 933–934 (Bankr.D.Colo.1985) (broker handling rental receipts). With specific regard to a joint venture, when a co-venturer holds the venture property in his name, he holds it in trust in the technical sense of § 523(a)(4). *In re Schwenn,* 126 B.R. at 353.

Thus, if Woods was actually entrusted with a *res* or trust property he could be denied discharge based upon his status as a joint venturer. The court below did conclude that defendant did possess a *res* by virtue of the power ("bundle of rights and authorization") to act for the venture and the venturers, including the power to encumber the venture property and impose personal liability upon the venturers. As such, the *res* would be one step removed from the actual entrustment of ven-

---

**5.** For example, the court's findings concern duties of notice (No. 28), disclosure (No. 31), duty to make inquiries (No. 29) and failure to advise to seek independent counsel (No. 37). Without more, such failures may well amount to negligence or malpractice but do not constitute breaches of § 523(a)(4) duties. *In re Hamilton,* 147 B.R. 779, 782–3 (Bankr. D.Colo.1992).

**6.** In this case no funds were "paid to a lawyer," and the notification rule, if construed to apply, would not suffice under *Young* to create a technical trust. 91 F.3d at 1371 (disclosure rule does not make lawyer a 523(a)(4) trustee).

ture property to the circumstance where the defendant had the power to affect the property and the venturers. In effect, the authorizations were a limited power of attorney to borrow money for venture purposes.

There is authority that, in proper circumstances, a power of attorney may create § 523(a)(4) fiduciary status. *In re Mones*, 169 B.R. 246, 257 (Bankr.D.D.C. 1994). For example, such status was found where the debtor was given a general, durable power of attorney providing him complete control over the assets in question (which he exercised for his self benefit). *In re Burgess*, 106 B.R. 612, 620–621 (Bankr.D.Neb.1989). In contrast, when a debtor was a general partner in a limited partnership (who therefore owed general fiduciary duties to the limited partners) and, as such; was given a power of attorney in the partnership subscription agreement, the power of attorney was deemed an ordinary commercial transaction and not a technical trust relationship triggering § 523(a)(4) liability. *In re Lang*, 108 B.R. 586, 589 (Bankr.N.D.Ohio 1989). The circumstances of this case-joint venture agreement and borrowing resolutions-are closely akin to the *Lang* case scenario. Certainly Woods did not have complete control over the venture property as a durable general power of attorney-the functional equivalent of entrustment of the property-would confer. Here the powers are limited to borrowing authority for construction of the second building in a three building project, a matter of ordinary commercial or contractual nature not normally triggering § 523(a)(4) liability. *See In re Evans*, 161 B.R. at 477.

Keeping in mind the narrow construction of exceptions to discharge and the fresh start objectives of bankruptcy and resolving doubts in the debtor's favor (*In re Kaspar*, 125 F.3d at 1361), I conclude as a matter of law that the appellees did not prove the existence of a § 523(a)(4) fiduciary relationship between Woods and themselves.

## 2. *Defalcation*

 Even assuming a § 523(a)(4) fiduciary status existed, appellees must still have proved a defalcation by a preponderance of the evidence. *In re Young*, 91 F.3d at 1371. The legal meaning of defalcation in this context is wide-ranging. Starting with the decision of Judge Learned Hand in *Central Hanover Bank and Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir.1937), deliberate wrong-doing such as embezzlement or fraud is not required. An element of intent or bad faith is not necessary. *In re Peterson*, 96 B.R. 314, 323 (Bankr.D.Colo.1988). Even negligence alone may suffice. *In re Kudla*, 105 B.R. 985, 991 (Bankr.D.Colo.1989). The general standard of liability repeatedly given, however, is the failure of the fiduciary to account for money or property (the *res*) entrusted to it. *See In re Peterson*, 96 B.R. at 322; *In re Winden*, 120 B.R. 570, 574 (Bankr.D.Colo.1990); *In re Storie*, 216 B.R. at 286. Further, the common fact pattern for liability is the trustee's use of the *res* for his or her self-interest. *See In re Olinger*, 165 B.R. 283, 285 (Bankr. D.Colo.1994); *In re Winden*, 120 B.R. at 572; *In re Kudla*, 105 B.R. at 988.

 Applying those general standards to this case, I first note that the claimed defalcation was a borrowing which was solely for joint venture purposes, *i.e.* to pay off the land loan, and that no part of the funds were diverted or misappropriated by the defendant for his or any other's personal benefit. Although appellees need not prove intentional wrong-doing or bad faith, I find no case concluding defalcation with facts similar to those presented here, namely borrowing money at favorable

terms to release land and enable the venture to proceed with its purposes of constructing new buildings.[7] It is also noteworthy that the appellees and all other venturers agreed to their individual liability when they obtained the ultimate permanent loan from Pacific.

Under these factual circumstances, it was legal error to conclude that defalcation occurred since there was no failure of the assumed fiduciary to account for the *res* that had been entrusted to him, the normal triggering event for § 523(a)(4) liability. Regardless of any argument concerning the authority initially to borrow the funds, it is clear that a full accounting of the borrowing and its payoff was made to all venturers.

Further, the bankruptcy court's ultimate legal conclusions of defalcation rest upon its erroneous factual findings that the first building's permanent loan terms were to be superimposed upon the second, distinct, borrowing resolutions for the Phase II building. In particular, the court below found defalcation because of the defendant's "mistake, oversight, and/or poor judgment" in his actions:

> (a) To approve and sign an obligation on an insider loan, without advance notice ..., (b) to approve and sign an obligation which exceeded the specific and express limitation of $2,500,000 attached to this phase of Merham's business, (c) to approve and sign on a loan without adequate investigation or fact finding, and (d) to approve and sign on a loan without timely, accurate and effective

delivery of material information ... to all venturer-obligors.

175 B.R. at 85.

The first conclusion completely disregards the express language of Exhibit 19 authorizing the management committee to borrow funds to satisfy the "installment liability on the land in which improvements shall be constructed." The second conclusion, exceeding the supposed $2.5 million limitation, improperly transports the terms of the permanent loan on the first building to the second phase of the project. The third conclusion, that there was not adequate investigation, is curious given, as the court found, the apparent reasonableness of the loan terms. The fourth supposed defalcation-approving the loan without providing material information to all other venturers-is again inconsistent with the express language of Exhibit 19 authorizing the committee to proceed with borrowing. These legal conclusions, based upon clearly erroneous factual findings, cannot stand and, in any case, do not provide a legal basis for concluding that the defendant was guilty of defalcation.

Accordingly, I order that the judgment of the bankruptcy court is reversed and the case is remanded to the bankruptcy court for entry of judgment in the defendant's favor and against the plaintiffs and for such further proceedings as may be appropriate.

---

7. In Finding No. 32, the court summarizes how the loan was paid off by the construction lender (Colorado Bank and Trust), which in turn was paid off by the permanent lender on the second building (Pacific Pioneer Savings). The court then inexplicably concludes that the Fox Ranch debt payoff made the loan from Pacific Pioneer "$58,276 more than it otherwise would have been." That is a non-sequitur as it can only be true if one completely disregards that the money was originally owed to the holder of the encumbrance on the land upon which Phase II was to be constructed.