**In re Danny Jay SCHEUER, Debtor.**

**Abraham LOCK, Plaintiff,**

v.

**Danny Jay SCHEUER, Defendant.**

Bankruptcy No. SA 90–00355 JR.

Adv. No. SA 90–0390 JR.

United States Bankruptcy Court, C.D. California.

March 29, 1991.

Michael A. Bertz, Los Angeles, Cal., for plaintiff.

Donald Segretti, Newport Beach, Cal., for defendant.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

Plaintiff obtained default judgment against debtor in the Central District Court of California in the amount of $118,962.82, plus a surcharge for violations of RICO in the amount of $237,925.64, plus attorney's fees of $17,500 (the "Judgment"). Plaintiff alleged in his district court complaint violations of the Commodity Exchange Act, breaches of fiduciary duties, common law fraud, and violations of the RICO Act. Judgment was joint and several against debtor, Modoc Trading Corporation ("Modoc") and F.G. Hunter & Associates ("Hunter"). On January 18, 1990, debtor filed a voluntary petition under Chapter 7. At the time of the filing, he had made no payments on the Judgment. Plaintiff timely filed a complaint for nondischargeability regarding the Judgment based upon

§ 523(a)(2)(A) and § 523(a)(4) of the Bankruptcy Code (the "Complaint"). After a two-day trial, I took the matter under submission primarily to decide the questions (1) whether debtor is a "fiduciary" subject to § 523(a)(4) and (2) whether the punitive element of the Judgment should be held nondischargeable.

## JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## STATEMENT OF FACTS

Plaintiff is a medical doctor residing in Brooklyn, New York. Around April 27, 1983, he read a Modoc advertisement in *USA Today* that read in part "SILVER— $10,000 WORTH OF SILVER FOR ONLY $1,500?" The advertisement went on to say "Call us now. We'll show you how to lock up $10,000 worth of silver with a $1,500 investment—a plan with high risk that could bring you high yield" (the "Modoc Program"). At the time, plaintiff had invested in silver valued at $47,000 (the "Silver") and was looking for an adviser for additional investments.

After contacting Modoc, he received calls from Mr. Gallagher and Mr. Lama who represented Modoc. Plaintiff explained to Gallagher and Lama that he had no experience in commodity futures or commodity future markets, that he had no desire to invest in futures, as he heard they were risky, and that his sole investment experience involved a mutual fund and the Silver. Plaintiff was told by Gallagher and Lama that the Modoc Program did not involve commodity futures or the futures market and that it was safer than investing in futures. They also said that they would guide him in his investment decisions each step of the way. Furthermore, they urged him to sell the Silver and reinvest the proceeds with Modoc.

Plaintiff asked Gallagher and Lama if Modoc was accredited, and he was told that it was. He was also given references. Plaintiff was encouraged to follow the recommendations of Gallagher and Lama. A week later plaintiff received a "welcome letter", "references sheet", brochure and a business card from "Al Gallagher" "Account Consultant of Modoc." Shortly thereafter, plaintiff invested $57,545.82, which included proceeds from the liquidation of the Silver.

In late May, based on the advice of Gallagher and Lama, plaintiff invested an additional $25,618.30, the proceeds of which came from the liquidation of his mutual fund holdings and savings. Shortly thereafter, he received a margin call from Modoc. On calling Gallagher and Lama, he was told that he had to protect his investment by sending additional funds to purchase more silver in order to reduce the average price of the silver he held, otherwise his total investment would be lost. He was given no other alternatives. Again, plaintiff followed the advice of Gallagher and Lama and sent an additional $35,798.70, representing borrowed funds and custodial funds that he held for his children.

Later, on August 11, 1983, while attending a medical convention in Miami, he received a call from Gallagher and Lama urging him to sell his silver short. Although initially opposed to the idea, plaintiff acquiesced, based on the arguments of Gallagher and Lama that he was about to lose everything, and he had no other choice. By this time, plaintiff was uncomfortable with what was happening. On August 15, 1983 he, therefore, lodged a complaint with Lama.

Shortly thereafter, he received a call from debtor. Debtor introduced himself as the President of Modoc and told him that he had reviewed plaintiff's transactions.

According to plaintiff, debtor criticized the short sale and Gallagher's buying and selling activities. Debtor suggested a liquidation of plaintiff's position and recommended he adopt a new investment strategy. He also indicated that plaintiff had been charged enough commissions and offered to forego charging commissions until he made up his losses.

Feeling somewhat better after talking to debtor, plaintiff left his investment with Modoc. Plaintiff was later introduced to Mr. Wilson, whom Lama stated would replace Gallagher on his account. On November 2, 1983, based on the recommendation of debtor and Wilson, plaintiff transferred the remaining $14,024.13 in his account to Hunter, a successor to Modoc. Through a series of purported transactions, Hunter dissipated plaintiff's remaining assets by December 1983.

Debtor testified that he had authorized the *USA Today* advertisement and it was designed to get people to call. If a person showed some interest, he was sent "junk" which included a welcome letter, signed by him as "Dan J. Shire" "President," customer agreement, brochure, and reference sheet. He stated that Modoc made its income from commissions on sales to customers like plaintiff and the spread between the retail and wholesale prices for the commodity (the "Spread"). He hired several sales persons to solicit customers and service customer accounts. He asserted that Modoc was not engaged in futures and was not required to register with the Commodity Futures Trading Commission. Debtor further stated that he instructed all sales persons to explain to a prospective investor the investment risks and determine the investor's suitability for the investment and ability to sustain any losses. Furthermore,

all orders were confirmed with the client within 24 hours.

Debtor's recollection of the August 1983 telephone call differed from plaintiff's testimony. According to debtor, he informed plaintiff that he had sustained enough of a loss and that he should trade elsewhere. He also told plaintiff that he would make an adjustment to the account regarding commissions. The last four trades on plaintiff's account were made without charges for commissions. Debtor did not remember any other conversation with plaintiff.

Debtor purchased Hunter, because most of his customers wanted to speculate and did not want to take delivery of the precious metals. Since Hunter was licensed, it was able to satisfy this demand for futures contracts.

Debtor testified that he advised his account executives not to "churn"[1] accounts. When asked if he had established standards to control "churning" of accounts, he stated that he had not. Rather, he relied on the acknowledgement of order, confirmation of transfers, and the lack of complaints to provide some protection. Supervision of customer accounts was limited to this reliance.

Mr. Edward Horwitz, a licensed registered representative and registered options principal employed by Bateman Eichler, Hill Richards, Inc. with 20 years of experience in the securities and commodities industry, reviewed plaintiff's transactions with Modoc and Hunter and concluded that there was excessive trading in plaintiff's accounts for the purpose of obtaining commissions and other income. He based his conclusion on many factors. These included the large number of in-and-out transactions in the same commodity, same-day transactions, excessive commissions charges (2% on the entire contract)[2],

---

[1]. "Churned" accounts usually reflect significant turnover in the early stages; that is, a very short holding period for the securities purchased, followed by longer holding periods in the later stages of the account. Thus, the typical churned account is churned in the early stages, generating large commissions at the outset. It is followed by less trading and longer holding periods in the latter stages, after significant commissions have been generated. *Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814, 819 (1980).

[2]. According to Horwitz, a 2% commission on the entire contract value of the transaction resulted in charges in excess of $1,000 on futures charges. In a recognized commodity exchange, the commissions would have only been about $100.

and short holding periods (an average of 13 days). Furthermore, on August 11, 1983 there was a short sale of no benefit to plaintiff of 13,000 ounces of silver when the account had silver long, which could have easily been sold without a commission charge.[3] There was also an extremely high proportion of commission charges to invested dollars; an extremely high transaction turnover rate;[4] and substantial gains for Modoc and Hunter at plaintiff's expense. Horwitz noted the conflict between plaintiff's background objectives and the investments in the Modoc Program. Lastly, he pointed out the high level of control Modoc personnel exercised over plaintiff's account, whereby plaintiff received little financial benefit, while Modoc and its personnel received considerable benefit through commissions and the Spread.

As for references provided by debtor to potential customers, plaintiff showed that debtor had listed two law firms who evidently had done prior legal work for Modoc, but had not given permission to use their firms as references.

## DISCUSSION

 Plaintiff asserts that the judgment should be found nondischargeable based on § 523(a)(2)(A) of the Bankruptcy Code. This section excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....." The elements of a § 523(a)(2)(A) claim are: (1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with intention of deceiving the creditor, (5) upon which the creditor reasonably relied, and (6) that resulted in damage to plaintiff.

*In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989); *Mortgage Guar. Ins. Corp. v. Pascucci* (*In re Pascucci*), 90 B.R. 438, 444 (Bankr.C.D.Cal.1988) (citing cases). Plaintiff must prove these elements by a preponderance of the evidence, rather than by clear and convincing evidence which had been the standard prior to the recent Supreme Court case of *Grogan v. Garner*, — U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 A preliminary question is whether § 523(a)(2) applies to this situation. In *Prudential–Bache Securities, Inc. v. Sawyer* (*In re Sawyer*), 112 B.R. 386 (D.Colo. 1990), the district court held that § 523(a)(2) did not apply when a broker purchases unauthorized contracts. The court defined a broker as "one who is engaged for others, on a commission, in negotiating contracts relative to property with the custody of which [sic] he has no concern." *Id.* at 389 (citing 12 C.J.S. Brokers § 2 (1980)). The court was unable to find any authority that held that when a broker makes an unauthorized purchase of a contract, he holds title to that contract and receives the benefits. Since title in the unauthorized contracts remains with the principal, the court held that debtor did not receive money, property, services or credit through false pretenses, false representation or fraud. According to *Sawyer*, the more appropriate remedy for the principal arises under § 523(a)(4), i.e. fraud or defalcation while acting in a fiduciary capacity. *Id.*

I disagree with the district court's holding in *Sawyer*. A broker obtains investment funds from its principal to invest, and he receives commissions and possibly other benefits by executing the principal's investment orders. Section 523(a)(2) does not limit itself to money or property *in which title transfers to the debtor*. Rather, it

---

**3.** From late April through late September 1983, the commission charges totalled $39,360, approximately 40% of the average invested dollars, or an annualized rate of charging commissions at 96% of invested dollars.

**4.** Trading frequency in plaintiff's account was one transaction every two trading days from late April through May 1983, one transaction every four trading days from June through August 11, one transaction every three trading days from August 15 through September, and two transactions every three trading days in November.

provides that a *debt* for money, etc., is nondischargeable "to the extent obtained by" debtor's bad acts as listed in the provision. I see nothing in § 523(a)(2) or its legislative history that precludes its application to the situation where a broker receives funds from its principal by misrepresenting the investment, and the principal loses its investment. Accordingly, plaintiff has stated a valid claim under § 523(a)(2).

■ The material misrepresentations or nondisclosures asserted by plaintiff include the following: (1) representing that the Modoc Program did not involve the sale of futures contracts; (2) failing to disclose that the Modoc Program was unsuitable for plaintiff; (3) failing to disclose the benefits received by Modoc (the 2% commission on the full contract value rather than plaintiff's investment and the Spread); (4) misrepresenting at least two of the references given in connection with the Modoc Program; (5) misrepresenting that Modoc was accredited; and (6) failing to disclose that Modoc was not a registered commodity futures merchant.

Debtor testified that he told Gallagher and Lama that he did not want to get involved in futures. Gallagher and Lama assured him that the Modoc Program did not involve the purchase of futures contracts. In *Commodity Fut. Trad. Com'n v. Co Petro Marketing*, 680 F.2d 573 (9th Cir.1982), the Ninth Circuit reviewed section 2 of the Commodity Exchange Act, as amended, (the "Act") 7 U.S.C. § 2, which excludes "cash forward contracts" from regulation under the Act. Section 2(a)(1) of the Act provides that the Commission has regulatory jurisdiction over "contracts of sale of a commodity for future delivery" and defines the term "future delivery" as not including any sale of a *cash commodity* with a deferred shipment or delivery. Such sales are usually referred to as "cash forward contracts," while *contracts of sale of a commodity for future delivery* are called "futures contracts". *Id.* at 577.

Co Petro often sold contracts for the future purchase of petroleum products. Under the agency agreement with the customer, Co Petro purchased a specified quantity of fuel at a fixed price for delivery at an agreed future date and received a deposit from the customer based upon a fixed percentage of the purchase price. Co Petro, however, did not require its customer to take delivery of the fuel. Co Petro's customers were usually speculators from the general public without any intent of taking delivery. *Id.* at 578. Reading the exclusion for cash forward contracts narrowly, the court held that the exception is inapplicable to contracts of sale for commodities which are "sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Id.* at 579.

Debtor responds pointing to language in the customer account agreement stating that the customer has the intent of taking delivery of the commodities. The reality, however, was that Modoc and its customers had no real expectation that delivery would take place. Moreover, the frequent trading of the commodities based on the actual or expectant swings in the underlying value of the contracts does not support debtor's contention that the Modoc Program involved cash forward contracts. Additionally, Modoc's primary sales pitch was directed at the general public, and it promoted the speculative nature of an investment in silver that allowed an investor to leverage its investment with a 15% down payment. The operation of the Modoc Program is very similar to the Co Petro program, where the customers were speculating in the underlying commodity without any expectation of taking delivery. Accordingly, I find that Modoc was dealing in futures contracts, contrary to its representations to plaintiff.

Plaintiff was not a sophisticated investor. He did not fully comprehend the risks associated with the Modoc Program. First, he was investing in futures contracts contrary to Modoc's representations. Second, Modoc manipulated his account by churning. Third, he was told he was being charged commissions of 2% on his investment. Instead, commissions were based on the full

contract price. It is true that he received statements which showed a commission charge based on the full contract price, but he did not understand the statements nor review them carefully. See *Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1200 (8th Cir.1982).[5] Fourth, the negative impact of the Spread and commissions on potential profits was not disclosed. With the high frequency of purchases and sales, these hidden transaction costs created excessive overhead that made it highly unlikely that plaintiff would ever benefit from the Modoc Program. These risks were not explained to plaintiff, who naively relied on the credibility of Modoc and its people.

A misrepresentation or failure to disclose information is material if it is "of the type that would affect the creditor's decision making process." *In re Greene*, 96 B.R. 279, 283 (9th Cir.1989). The above misrepresentations and failures to make full and complete disclosures regarding the Modoc Program, its suitability for plaintiff and its risks were clearly material. Plaintiff would not have invested if he had known the true circumstances and potential adverse impacts resulting from an investment in the Modoc Program.

■ Based on the evidence, Modoc certainly intended to deceive plaintiff regarding the nature and risks associated with the Modoc Program. Plaintiff reasonably relied on what he read and was told. He was not a sophisticated investor. He placed his trust in Modoc. Modoc represented itself to be a reputable firm dealing in commodities. He was told that it was accredited. He was given references, and he checked with Security Pacific Bank to confirm that Modoc had an account with Security. He might have done more to protect himself, but he was not required to do more to satisfy the reliance requirement. This is especially true in light of the fiduciary relationship between a broker and customer. *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal.App.3d 174,

201, 210 Cal.Rptr. 387 (1985). The necessity for investigation and discovery of the facts is less, given the nature of the relationship. *Id.* at 202, 210 Cal.Rptr. 387. Accordingly, I find that plaintiff reasonably relied upon the representations of Modoc and its representatives.

The tricky element for plaintiff to satisfy is debtor's knowledge of the falsity of the representations. Debtor argues that he did not know that Gallagher and Lama were making these representations, and such representations were inconsistent with his instructions to them. When asked how he monitored what was being said by his sales persons, debtor admitted that he had no program. Rather, he relied on confirmation of the transactions and lack of complaints from customers to provide the requisite protections. On its face, this reliance was foolish; in reality, it was misplaced. Furthermore, debtor did receive a complaint from plaintiff. He called plaintiff to discuss the complaint. He readily admitted to plaintiff that trading in his account by Gallagher was excessive. He also admitted that the short sale in August was unnecessary, yet he did not change what was happening. Excessive trading continued in plaintiff's account.

The evidence is overwhelming that plaintiff's account was churned by Modoc. When a broker engages in excessive trading, disregarding its customer's investment objectives for the purpose of generating commissions and other benefits, the customer may hold the broker liable. *Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814, 820 (9th Cir.1980). The elements of churning have been satisfied by plaintiff in that (1) the trading in his account was excessive in light of his investment objections, (2) Modoc through Gallagher and Lama exercised control over the trading in the account, and (3) Modoc acted with intent to defraud by willfully and recklessly disregarding the interests of plaintiff. *Id.* at 821. At a minimum, Modoc demonstrated a reckless disregard for the welfare of

---

**5.** "When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts

have generally refused to find that they relieve a broker of liability for its misconduct." *Id.*

plaintiff, and at worst it was a party to a scheme to defraud plaintiff.

■ A principal is liable for the actions of his agents. *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 803 F.2d 454, 461 (9th Cir.1986). Modoc had a duty to supervise its sales persons. *Id.* It did not do that. For all intents and purposes, debtor was Modoc. He was the sole owner and principal officer of Modoc. Debtor was the ultimate beneficiary of any benefits Modoc received. Along with the benefits, debtor must bear responsibility for what happened. This is especially appropriate here where debtor designed the Modoc Program, approved the marketing scheme, and had responsibility for supervising Modoc's sales persons.

Lastly, the plaintiff has demonstrated damages resulting from the actions of Modoc and its representatives, Gallagher and Lama, for which debtor is responsible. Plaintiff lost his total investment. Accordingly, plaintiff has satisfied all the elements of a § 523(a)(2)(A) cause of action.

Plaintiff requests that both the compensatory and punitive elements of the Judgment be found nondischargeable. The Judgment includes treble damages based upon the RICO cause of action. I shall address that issue after resolving the question whether § 523(a)(4) applies to this relationship between Modoc and plaintiff.

■ Debts which arise from "fraud or defalcation," while the debtor is acting in a "fiduciary capacity," are nondischargeable in bankruptcy under § 523(a)(4) of the Bankruptcy Code. It is understood that the broad definition of fiduciary involving a relationship of confidence, trust and good faith is inapplicable in the dischargeability context. *In re Short,* 818 F.2d 693, 695 (9th Cir.1987). Constructive or implied trust are, therefore, excluded. However, statutory trusts are not. *In re Pedrazzini,* 644 F.2d 756, 758 n. 2 (9th Cir.1981). Fiduciary in this context is, therefore, a narrowly defined question of federal law, although state law may be consulted to determine when a trust exists. *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986). Additionally, the trust must have been created be-

fore the act of wrongdoing, and the debtor must have been a trustee before the alleged wrong. *Id.* at 796.

In *Short,* the Ninth Circuit looked at the Washington statute and case law and determined that partners in Washington were fiduciaries for the partnership and each other. *Short, supra,* at 695–96. Earlier, the Ninth Circuit reached the same conclusion in *Haller* after reviewing California statutory and case law. *Haller, supra* at 796–97. In both cases, § 523(a)(4) was found applicable, because both statutory and case law supported a special fiduciary relationship between partners. The question here is whether a similar special relationship arises under California law between a securities broker and its customer. I found no Ninth Circuit case directly on point.

In *Sawyer,* the district court found that a commodities broker was a fiduciary under § 523(a)(4), based upon its review of the Commodities Exchange Act, 7 U.S.C. §§ 1–26 and the regulations promulgated thereunder. The court concluded that the Act and regulations placed specific limits on the actions of brokers with respect to customer funds, thereby giving rise to a trust relationship. *Sawyer, supra,* at 390. It distinguished *Hill v. Bache Halsey Stewart Shields, Inc.,* 790 F.2d 817 (10th Cir. 1986), which came to the opposite conclusion.

In *Woosley v. Edwards (In re Woosley),* 117 B.R. 524 (9th Cir.BAP 1990), the court held that a California real estate broker was a fiduciary under § 523(a)(4). The Bankruptcy Appellate Panel (the "BAP") stated:

Mr. Woosley's real estate license carries with it fiduciary obligations to his principals under California law when carrying out licensed activities. With respect to licensed activities, real estate licensees have the same obligations as trustees under California law, including duties to refrain from making misrepresentations or obtaining any advantage over their principals, and to make the fullest disclosure of all material facts concerning the

transaction that might affect their principal's decision.

*Id.* at 529 (citing *Smith v. Zak,* 20 Cal. App.3d 785, 792, 98 Cal.Rptr. 242, 246–47 (1971).

This reliance on the licensed activities of a real estate broker is strange, because no listed activity appears to support a statutory trust relationship. However, the BAP concluded that "As with partnership fiduciary duties, the fiduciary obligations of a real estate licensee do not arise merely from the beneficiary's 'confidence, trust and good faith' with respect to the trustee; they are imposed explicitly by state law." *Id.*

The *Smith* case cited in *Woosley* does help with the analysis. In *Smith,* the court makes reference to Civil Code § 2322 to support its finding that the obligations imposed on a real estate agent are the same as those imposed on a trustee. *Smith, supra,* at 792, 98 Cal.Rptr. 242. Section 2322 has been amended since *Smith* to provide that

> An authority expressed in general terms, however broad, does not authorize the agent to do any of the following: (a) Act in the agent's own name, unless it is the usual course of business to do so. (b) Define the scope of the agency. (c) Violate a duty to which a trustee is subject under * * * § 16002, 16004, 16005, or 16009 of the Probate Code.

■ Section 16002 entitled "Duty of Loyalty" provides that a trustee has the duty to administer the trust solely in the interest of the beneficiaries. This duty of loyalty is a requirement of every agent in California. It is axiomatic that a securities broker is an agent for his principal, the customer. Modoc was plaintiff's agent. As I have already mentioned, Modoc, through its representatives Gallagher, Lama and debtor, did not act solely in the best interests of debtor. They churned plaintiff's account to his detriment in order to maximize the benefits to Modoc. This was a breach of their duty of loyalty to plaintiff. Plaintiff had a right to expect that Modoc would act in his best interests and place those interests above its own. This was not done. In addition to

this statutory duty of loyalty between agent and principal, California case law holds that a securities broker is a fiduciary for its customer. *Vucinich, supra* at 460; *Hobbs, supra,* 164 Cal.App.3d at 201. Clearly, under California law a securities broker has the duties of a trustee to act in the best interests of its client. Accordingly, I hold that Modoc and its principal, debtor, are fiduciaries under § 523(a)(4).

Turning to the question whether the full amount of the Judgment, including the treble damages resulting from the RICO claim, should be held nondischargeable under § 523(a)(2)(A) and § 523(a)(4), I acknowledge a split of authority regarding this question. Debtor did not contest the legal basis for the RICO finding in the district court or here. Rather, debtor contends that the punitive part of the Judgment (i.e. the treble damage award based on the RICO violation) as a matter of law should be found dischargeable, even though the compensatory element of the Judgment is held nondischargeable. Debtor cites *In re Ellwanger,* 105 B.R. 551 (9th Cir.BAP 1989), to support his argument. In *Ellwanger,* the BAP in a § 523(a)(2) nondischargeable proceeding held that the penalty element of a state court judgment was dischargeable, even though the compensatory part was nondischargeable. The court stated, "Numerous cases are in accord with this court's holding that exceptions to discharge under § 523(a)(2) are limited to compensatory damages." *Id.* at 555.

The BAP pointed out that § 523(a)(7), which provides for the nondischargeability of a debt owing to a governmental unit for a fine, penalty, or forfeiture, was a limited exception to this general rule. The BAP reconciled § 523(a)(2) with § 523(a)(7), stating that "Congress intended noncompensatory damages to be excepted from discharge only where they are owed to a governmental entity." See *In re Suter,* 59 B.R. 944, 947 (Bank.N.D.Ill.1986).

The BAP also emphasized that as an exception to discharge, § 523(a)(2) impairs a debtor's fresh start and, therefore, should be read narrowly in effectuating the

policy against debtors that except from discharge debts incurred as a result of their actual fraud. *Ellwanger, supra,* at 556.

My problem with the *Ellwanger* holding is that it appears to conflict with the legal rationale reflected in *In re Adams,* 761 F.2d 1422 (9th Cir.1985). In *Adams,* the court held that both the compensatory and punitive damage parts of a judgment are subject to a finding of nondischargeability under § 523(a)(6). The debtor in *Adams* was assessed general damages of $258,000 and punitive damages of $75,000 for injuries sustained by the plaintiff in an automobile collision that resulted in a guilty verdict against the debtor for drunk driving. At the bench trial in district court on the issue of nondischargeability, the debtor argued that only the punitive damage part of the judgment should be found nondischargeable, because that was the penalty part of the award imposed to punish him as a wrongdoer. The Ninth Circuit rejected this argument, relying on *Coen v. Zick,* 458 F.2d 326 (9th Cir.1972).

*Zick* was a pre-Code case that addressed the scope of dischargeability under § 35(a)(8) of the Bankruptcy Act, § 523(a)(6)'s predecessor. In *Zick,* the debtor filed a bankruptcy after a state court judgment for $5,100 compensatory damages and $1,000 punitive damages. The bankruptcy court granted a discharge of the compensatory damages, but denied the discharge as to the punitive damages. Both sides appealed. The *Zick* court decided that the judgment represented one claim for damages that consisted of both compensatory and punitive elements arising from the same acts. *Id.* at 329. The *Zick* court reversed the bankruptcy court, holding that because both compensatory and punitive elements of the damage award arose from the willful and malicious injuries to *Zick,* the full amount of the judgment should be nondischargeable. *Id.* 329–30.

Following *Zick,* the *Adams* court stated that "[t]he exception to discharge turns upon the nature of the act which gave rise to the liability rather than upon the nature of the liability." *Adams, supra,* at 1427. Since the act of driving while intoxicated caused the injuries for which the debtor was liable, both compensatory and punitive elements of the damage award resulting from that act were be held nondischargeable.

In affirming the district court, the Ninth Circuit concluded that there was no indication Congress intended to limit the scope of nondischargeability to punitive damages. *Id.* at 1428. The court did not discuss § 523(a)(7), which was a pivotal factor supporting the BAP's contrary view in *Ellwanger.*

The *Ellwanger* holding is an unusual result in light of the *Adams* precedent, because the BAP's rationale in *Ellwanger* seems to conflict with the Ninth Circuit's rationale in *Adams.* I understand that we are dealing with two different sections of § 523. However, under both § 523(a)(2) and § 523(a)(6), the court must find that the debtor intended to do the act that caused the injury to the plaintiff. As the *Zick* court stated:

> The exception is measured by the nature of the act, i.e. whether it was one which caused willful and malicious injuries. All liabilities resulting therefrom are nondischargeable. One liability is limited to actual compensation, presumably out of pocket expense, loss of profits, and other provable damages. But for this type of conduct, yet another liability may be incurred if the jury under proper instructions sees fit to award it. That is for punitive damages. Both types of liability are within the statute as "liabilities" for "willful and malicious injuries to the person or property of another."

*Id.* at 329–30. See also, Ryan, *Punitive Damages: Dischargeable or Not in Bankruptcy,* 18 Cal.Bankr.J. 291.

The bankruptcy court is a court of equity. The bankruptcy judge, therefore, should have the power to review all the facts and circumstances relating to the judgment and decide whether the penalty element should be held nondischargeable along with the compensatory element. Some factors that the judge might consider include (1) the extent to which the acts causing the liability were willful and mali-

cious, (2) debtor's culpability, (3) the extent to which the compensatory element of the judgment adequately redresses the wrong done to the claimant, (4) the legal and factual justification for the penalty, and (5) the impact of the penalty on debtor's ability to achieve a "fresh start".[6]

 Application of the above factors to debtor's situation follows: First, the acts giving rise to the Judgment were performed willfully and maliciously in that Modoc intentionally misrepresented the Modoc Program to plaintiff and churned plaintiff's account. Second, debtor must bear the ultimate responsibility for the harm to plaintiff resulting from these bad acts. However, no evidence linked debtor directly to specific misrepresentations or acts of churning. His culpability is primarily indirect as the principal architect and promoter of the Modoc Program. Third, the compensatory part of the Judgment adequately compensates plaintiff for the harm caused by debtor. As a matter of fact, plaintiff previously received a $40,000 payment from other parties to compensate for his loss. Fourth, the penalty results from the application of RICO to this transaction. I am troubled by the use of RICO in this situation. The only reason I can see for its use was to increase the award. For a statute originally designed to attack racketeering from the civil side, I am uncomfortable blessing its use under these circumstances to overburden debtor with a $237,925.64 penalty, especially when the Judgment was granted by default. Lastly, I believe the penalty is too severe, and it will undoubtedly foreclose any fresh start opportunity for debtor.

Weighing these factors in light of the general rule that exceptions to discharge should be narrowly construed and in light of equitable considerations, I hold that the $237,925.64 penalty element of the Judgment is dischargeable. The balance of the Judgment is nondischargeable.

Separate findings of fact and conclusions of law with respect to this ruling are unnecessary. This memorandum opinion shall constitute my findings of fact and conclusions of law.

---

**6.** The above list of factors is not exclusive. I am sure on a case-by-case basis other factors might appropriately be considered in making this determination.