In re Bruce E. MONES, Debtor.

**Harvey JACOBS and Jerome Shapiro, Plaintiffs,**

v.

**Bruce E. MONES, Defendant.**

Bankruptcy No. 88–01037.
Adv. No. 89–0014.

United States Bankruptcy Court,
District of Columbia.

June 22, 1994.

As Amended July 26, 1994.

David Lynn, Docter & Docter, P.C., Washington, DC, for defendant.

Glenn M. Cooper, Paley, Rothman, Goldstein, Rosenberg & Cooper, Chtd., Bethesda, MD, for plaintiffs.

## DECISION DENYING DEFENDANT'S MOTION TO DISMISS DISCHARGEABILITY COMPLAINT

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This is a suit against an investment adviser for fraudulently inducing the plaintiffs to invest in risky options and seeking to hold the claims nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). The defendant seeks to dismiss the plaintiffs' amended complaint for failure to state a claim upon which relief can be granted. The court has *sua sponte* reconsidered its prior oral ruling and decides in this decision to deny the defen-

dant's motion to dismiss the plaintiffs' amended complaint.

## I. INTRODUCTION

By their amended complaint, the plaintiffs, Harvey Jacobs and Jerome Shapiro ("plaintiff"), trustees under the trust ("the Trust") established by the will of Gilbert Shapiro, seek a judgment fixing damages against the debtor, Bruce E. Mones, and declaring the judgment to be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).

Plaintiffs assert five counts against the defendant. Count I alleges securities fraud in violation of 15 U.S.C. § 78j(b) (Section 10(b) of the Securities Act of 1934) and 12 C.F.R. § 240.10b–5 (Rule 10b–5). Count II alleges violations of the District of Columbia's securities laws, D.C.Code Ann. § 2–2613. Damages sought for Counts I and II total $184,785.25 plus interest. Count III is a common law fraud action. Count IV alleges breach of fiduciary duty. Damages sought for Counts III and IV total $877,024.49.

## II. FACTUAL BACKGROUND

For purposes of a motion to dismiss, the allegations of a complaint must be accepted as true. The amended complaint alleges the following.

Mones, an investment adviser registered with the Securities and Exchange Commission, was hired by the Trust sometime prior to November of 1986. As an adviser, defendant invested the Trust's funds in stocks traded on the New York Stock Exchange ("the Exchange"), utilizing an investment strategy that was relatively conservative and resulted in moderate but steady gains. In May of 1987, Mones suggested that the Trust invest in his "option income program" ("option program") which Mones described as very safe and relatively risk-free. Unlike the prior investments which generated a 1% commission for Mones, he received an annual commission of 2% of the portfolio value for managing an option program account. Relying on Mones' representations, the Trust invested in excess of $757,000 in the option program.

Upon Mones' suggestion, on July 15, 1987 the Trust opened a securities account with Tucker, Anthony, & R.L. Day, Inc. ("Tucker"), a broker-dealer of securities. At this time, Mones was granted a power of attorney to buy and sell securities on the Trust's behalf. As of September 30, 1987, the Trust's account at Tucker had a balance of $709,617. In mid-October of 1987, the value of the securities on the Exchange dropped precipitously, causing large losses in the account. As of October 31, 1987, the account with Tucker had a debit balance of $167,407.49.

Mones misrepresented and omitted material facts concerning the risk involved in investing in the option program. Mones was well aware of the true risks associated with trading options but purposely misled the Trust in order to generate greater commissions for his personal benefit. As a result of these untrue and misleading representations and omissions, the Trust suffered a loss in excess of $877,024.49. Additional facts alleged by the amended complaint are discussed below.

## III. EXCEPTIONS TO DISCHARGE

Plaintiffs allege that any judgment awarded pursuant to Counts I, II and/or III is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) on the basis that the debtor fraudulently misrepresented the nature and risk of the option program. Plaintiffs additionally allege that a debt founded upon Count IV is excepted from discharge pursuant to § 532(a)(4) as such debt was incurred by defendant's fraud or defalcation while acting in a fiduciary capacity.

### A. *Section 523(a)(2)(A) Exception to Discharge*

Plaintiffs claim that the debtor obtained money by false representations or actual fraud in violation in 11 U.S.C. § 523(a)(2)(A) by falsely representing that the option program was a relatively conservative investment that was free of significant risk of loss. In addition, plaintiffs allege that the defendant fraudulently failed to disclose that (1) the program was risky; (2) losses could mount the longer it took to exit a losing

position; (3) a falling market could lead to huge losses; and (4) the trust could lose funds in excess of the amount in its account.[1]

### 1. *Interpretation of the Term "Obtaining Money"*

■ As a preliminary matter, the court must consider whether the debt sought to be held nondischargeable is a debt for "obtaining money."[2] Defendant contends that even if the court assumes that fraud was involved, the only money "obtained" by the defendant was his commissions and, therefore, any exception to discharge pursuant to § 523(a)(2)(A) must be limited to that amount.

Courts disagree whether a debtor himself must actually receive the money that he has obtained by fraud before nondischargeability can apply. Three different views have emerged. *In re Wade*, 43 B.R. 976 (Bankr. D.Colo.1984) (listing the cases adopting each view and their reasoning). The first view, which is that set forth by the defendant, requires that the debtor personally receive the money that he obtained by fraud. The second approach, characterized as the "receipt of benefits theory," requires only that the debtor derive a benefit from the money that the debtor obtained by fraud; whom the money was obtained for is irrelevant. Finally, the third approach holds that the excep-

tion applies whenever the debtor fraudulently obtains money, irrespective of whether it is for himself and whether the debtor received any benefit.

■ Although this court initially indicated its agreement with the first view in its earlier oral decision, after closer analysis, the court finds its earlier view to be incorrect and rejects the first view. Requiring that the debtor obtain money for himself limits the meaning of the term "obtain" when no such limitation is expressly or implicitly found in the provision's language. *See In re Winfree*, 34 B.R. 879 (Bankr.M.D.Tenn.1983) (citing *In re Kunkle*, 40 F.2d 563, 563–64 (E.D.Mich.1930)). Moreover, the courts that have adopted this view fail to offer any basis for requiring that the debtor himself receive the money. *See In re Jacobs*, 54 B.R. 791 (Bankr.E.D.N.Y.1985); *In re Cohen*, 69 B.R. 9 (Bankr.E.D.N.Y.1986); *In re Rifkin*, 142 B.R. 61, 64–65 (Bankr.E.D.N.Y.1992).[3] And although exceptions to discharge are to be construed narrowly, that canon of construction does not provide an avenue for imposing limitations that are not implicit in either the provision itself or the supporting legislative history. Therefore, this court finds no justification for limiting the statute's application, as the defendant urges, to those instances

---

**1.** 11 U.S.C. § 523(a)(2)(A) provides, in pertinent part:

> A discharge does not discharge an individual debtor from any debt—
>
> (2) for money, property, or services, . . ., to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud . . .

**2.** The statute's language provides that a debt for "money, property, or services . . ., to the extent obtained by . . ." fraud is nondischargeable. Although this language appears to be somewhat ambiguous, the relevance of the term "obtained" becomes apparent upon examining the earlier versions of this provision. Under section 17a(2) of the Bankruptcy Act which excepted from discharge "liabilities for obtaining money or property by false pretenses . . .", the term "obtaining" clearly qualified the phrase property such that if the debtor obtained property by fraud, the debt arising from such fraud was nondischargeable. When Congress enacted the Bankruptcy Code, section 523(a)(2) provided for nondischargeability of a debt "for obtaining money . . . by" fraud. This provision was amended in 1984 by § 454(a)(1) of the Bankruptcy Amendment Act to

the current version. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333. However, this amendment was purely technical in nature and was not intended to change the previous interpretations of the provision. Thus, it is clear to this court that the phrase "obtained" in the statute's current version still qualifies "money, property or services."

**3.** In *Cohen*, the facts are similar to this case. The plaintiff sued her financial consultant for commissions paid and option trading losses she suffered as a result of defendant's fraudulent advice. The court held that only a debt equal to the amount of the commissions was nondischargeable because "the debtor *himself* must 'obtain' money by fraud." *Cohen*, 69 B.R. at 11. However, the court did not provide any reason for imposing this requirement other than citing to an earlier opinion, *Jacobs*, which simply stated that it would impose the requirement because there was no contrary precedent. *Jacobs*, 54 B.R. at 793. However, as set forth above, there is contrary precedent.

where the money obtained by fraud was obtained by the debtor for himself.

With respect to the second view, several courts have noted that "the better view appears to be that the debtor need not actually procure money or property for himself. If the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable." *In re Holwerda,* 29 B.R. 486, 489 (Bankr.M.D.Fla.1983) (defendant who was principal of company receiving the loan benefitted and therefore obtained money) (citing *Hyland v. Fink,* 178 N.Y.S. 114, 115 (N.Y.App.Div.1919)); *Winfree,* 34 B.R. at 883 (defendant who was principal in real estate project benefitted from money invested by plaintiff in the project).

Only *Wade,* 43 B.R. at 981–82, and *In re Ward,* 115 B.R. 532, 538 (W.D.Mich.1990), actually hold that absent the debtor's receipt of a benefit the debt is discharged: in the other cases a benefit was found to be present. Likewise, only *Wade* and *Ward* (which essentially just follows *Wade*) articulate any basis for adhering to the second view instead of the third view.

Because a benefit was conferred on the debtor here, it is unnecessary to decide whether *Wade* and *Ward* were correctly decided. But I must at least respectfully question the three grounds set forth in *Wade* and *Ward* for rejecting the third view.

■ First, Congress was not confronted with a longstanding receipt of benefits theory. As the Supreme Court held in *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 246 and n. 8, 109 S.Ct. 1026, 1033 and n. 8, 103 L.Ed.2d 290 (1989), a statutory interpretation that is not uniformly accepted at the time Congress acts is "certainly not the type of 'rule' that we assume Congress was aware of. . . ." *See also Dewsnup v. Timm,* — U.S. ——, ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (when pre-Code practice is uniform, "Congress must have enacted the Code with a full understanding

of this practice"). Here, the lower state and federal courts were divided and the Supreme Court has never ruled on the question.

■ Second, the requirement of narrow construction of discharge exceptions announced in *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915) ("property" cannot be read as including services), is that the exceptions to discharge are limited to those plainly expressed. The requirement ought not be employed to supply a requirement of benefit neither plainly expressed nor even implicitly contemplated. The benefit requirement is not necessary to protect the honest debtor[4] and is at variance with the plain language of the statute. To argue, as in *Gleason,* that "property" includes services is wholly different from reading obtaining property as including obtaining the property for the benefit of either the debtor or others.

Third, if the third view is followed, the Code's use of the word "obtaining" (in the pre–1984 version of § 523(a)(2)) would not, as *Wade* contends, have been superfluous. If the word "obtaining" were deleted, the statute would have applied to a debt "(2) for money . . . by" enumerated species of fraud, an unintelligible articulation. The word "obtaining" is only half the story: it is paired with the word "by." The term "obtaining by" is used to limit nondischargeable debts for money to instances in which the money was obtained by some species of fraud, as opposed to those when the money was obtained by honest means. The statute is completely neutral as to the question of for whose benefit the debtor obtained the money.

■ Had Congress intended § 523(a)(2)(A) to be limited to money obtained for the debtor or for his benefit, it knew how to do so. In § 14(c)(3) of the Bankruptcy Act Congress denied discharges to a bankrupt if the bankrupt, *inter alia,* "while engaged in business as a sole proprietor, partnership, or as an executive of a

---

4. Nevertheless, the presence of an economic benefit is obviously of relevance in determining whether the debtor acted with an intent to deceive. But motivations besides economic benefit may form the basis of an intent to deceive. The absence of an economic benefit, therefore, is not definitive in negating an intent to deceive and is irrelevant for purposes of a motion to dismiss for failure to state a claim upon which relief can be granted.

corporation, *obtained such business* money or property or credit ... by making ... a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation." (Emphasis added.) Congress's failure similarly to limit the word "obtaining" or "obtained" in either § 17(a)(2) of the Bankruptcy Act or either the pre–1984 or post–1984 versions of § 523(a)(2)(A) thus demonstrates a lack of any restriction of nondischargeable debts to those for money obtained for the debtor or for his benefit.

As the court in *In re Scheuer,* 125 B.R. 584, 588–89 (Bankr.C.D.Cal.1991), noted:

> Section 523(a)(2) does not limit itself to money or property *in which title transfers to the debtor.* Rather, it provides that a *debt* for money, etc., is nondischargeable "to the extent obtained by" debtor's bad acts as listed in the provision.

There is "nothing in § 523(a)(2) or its legislative history that precludes its application to the situation where a broker receives funds from its principal by misrepresenting the investment, and the principal loses the investment." *Scheuer,* 125 B.R. at 589.[5]

The court in *Scheuer* found it unnecessary to decide whether the third view controls, as does this court, because a benefit is present.

### 2. *Application of the Term "Obtaining Money" to the Facts of this Case*

■ Applying the foregoing discussion to the facts of this case, I first note, without deciding the issue, that it is arguable that the debtor in this case obtained the funds even under the first view. The debtor is alleged to have fraudulently advised the plaintiffs to invest funds in the defendant's option program. Although title to the invested funds remained with the Trust, the debtor had complete control over those funds via a power of attorney and this control was gained by the debtor's alleged fraudulent misrepresentations. Therefore, that the funds were

placed in an account at an independent brokerage house rather than in the debtor's own trading account is of no consequence to the provision's applicability. He obtained the funds by placing them in an account over which he had control. Thus, even under the first view he arguably obtained the funds.

■ Furthermore, the debtor clearly obtained the funds under the second view because he can be said to have benefitted from the money that he fraudulently obtained control of. *See, e.g., Scheuer,* 125 B.R. at 588 (broker benefitted from money he fraudulently induced client to invest in trading program); *In re Ashley,* 903 F.2d 599, 604 (9th Cir.1990) (defendant's financial interest in the company "placed him in a position to benefit from any infusion of capital to that enterprise and therefore inducing [the plaintiffs] to invest in [the company] was indeed obtaining something for himself"). Defendant received an annual commission of 2% of the portfolio value for managing the Trust's account in the option program (as opposed to the 1% commission under prior investments). Therefore, the defendant had a financial interest in the amount of money the Trust invested in the option program. Given the nature of his interest, the defendant can be said to have benefitted from the entire amount of the money obtained—the more money invested, the greater likelihood of a higher commission.

■ As one court has held, "[f]inancial benefit to the debtor is a *sufficient* condition to finding that the debtor 'obtained money' under section 523(a)(2)." *Winfree,* 34 B.R. at 883. And having determined that the defendant in this case received a benefit, § 523(a)(2) would apply even if benefit to the debtor is also a *necessary* condition. Moreover, because the defendant is alleged to have obtained the entire amount of the money invested in the option program by his

---

5. In *Scheuer,* plaintiff sought to have determined nondischargeable a judgment obtained against the debtor who was the principal in a brokerage firm that has acted as plaintiff's investment adviser. Upon finding that the debtor "obtained the money" in that he encouraged the investments, that the debtor received a benefit in the form of commissions and that the elements of section 523(a)(2)(A) had been established, the court held that the entire judgment, which had been awarded for the brokerage firm's violations of the Commodity Exchange Act, breaches of fiduciary duty, common law fraud, and RICO violations, was nondischargeable except with respect to the amount of punitive damages.

fraudulent misrepresentations, the entire debt will be excepted from discharge. *See In re Hecker,* 95 B.R. 1, 2 & n. 4 (Bkrtcy. D.D.Col.1989) (entire debt is nondischargeable when entire loan was obtained by false representations); *Birmingham Trust Nat'l Bank v. Case,* 755 F.2d 1474, 1477 (11th Cir.1985) ("the plain language of the statute [which simply provides that the *debt* will not be discharged] suggests that dischargeability is an 'all or nothing' proposition"). The requirement that the debtor benefit from the money obtained by fraud only affects the issue of the statute's applicability. However, there is no suggestion that a debt for money obtained by fraud should be nondischargeable only to the extent of the benefit received. Rather, upon finding a benefit, the entire debt resulting from the defendant's fraudulent actions is nondischargeable.

Accordingly, the defendant's request that the plaintiffs' complaint be limited to the amount of the commissions will be denied.

3. *Whether Alleged Securities Law Fraud in Counts I and II Suffices to Establish Fraud Under § 523(a)(2)(A)*

In addition to the defendant's argument that section 523(a)(2)(A) is limited to the amount of any commissions, the defendant contends that any judgment awarded pursuant to Counts I and II for violations of federal and state securities laws fails to give rise to a debt that may be held nondischargeable pursuant to section 523(a)(2). Defendant argues that because fraud as defined in the securities laws is broader than fraud in the Bankruptcy Code,[6] which the plaintiffs have conceded, as a matter of law such violations are insufficient to constitute an exception to discharge.

Defendant's argument, however, is flawed because it assumes that a person who violates the securities laws never does so by committing actual fraud. It is certainly possible to envision a violator of the securities laws who does so with actual intent to deceive. *See, e.g., In re Der,* 113 B.R. 218, 230 (Bankr.D.Md.1989) (judgment for violation of

Section 10(b) of the Exchange Act and Rule 10b–5 rose to level of actual fraud and was held nondischargeable under § 523(a)(2)). The facts as alleged by the plaintiff could plausibly support a finding of actual fraud. *See McGowan v. Warnecke,* 739 F.Supp. 662 (D.D.C.1990) (motion to dismiss not granted unless it appears beyond doubt that plaintiff could prove no set of facts in support of its claim that would entitle it to relief). Therefore, the court rejects the defendant's argument that section 523(a)(2)(A) does not apply as a matter of law to any judgment awarded pursuant to Counts I and/or II.

Plaintiffs have sufficiently alleged facts to support a claim for nondischargeability pursuant to section 523(a)(2)(A). To find a debt nondischargeable, the following elements must be established by a preponderance of the evidence: (1) a representation of fact by the debtor; (2) that was material; (3) that the debtor knew at the time to be false; (4) made with the intention of deceiving the creditor; (5) upon which the plaintiff relied; and (6) that resulted in loss or damage as the proximate consequences of the representation. *See In re Pascucci,* 90 B.R. 438, 439 (Bankr.C.D.Cal. 1988), and cases cited therein.

Defendant is alleged to have made misrepresentations concerning the nature of the option program and its attendant risk. And because the defendant acted as an investment adviser, such representations cannot be deemed to constitute mere puffery. *See Ashley,* 903 F.2d at 604; *In re Dowd,* 116 B.R. 26, 28 (Bankr.D.Conn.1990). The risk involved and the losses that may arise are certainly material to an investor when determining whether a particular investment program is suitable. *In re Greene,* 96 B.R. 279, 283 (9th Cir. BAP 1989) (information is material if it is "of a type that would affect the creditor's decision making process"). Moreover, plaintiffs allege that the defendant knew that the program was not as he described and that he intentionally misrepresented the program intending to convince the

---

**6.** For a debt to be nondischargeable under section 523(a)(2), the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law is insufficient. However, the securities laws can be violated upon the showing of scienter which may not rise to the level of actual fraud.

plaintiffs to invest in the program so that he would earn a higher commission. Given the nature of the relationship between the plaintiffs and the defendant, it was reasonable for the plaintiffs to rely on defendant's representations. *Scheuer,* 125 B.R. at 590. Finally, plaintiffs have alleged that but for those representations, they would not have invested in the program and, therefore, their loss would not have occurred.

Based on the discussion above, a judgment awarded pursuant to Counts I, II and/or III could plausibly be held nondischargeable pursuant to section 523(a)(2)(A). Accordingly, plaintiffs' complaint with respect to this provision will not be dismissed.

### B. Section 523(a)(4) Exception to Discharge

■ Plaintiffs additionally allege that the debtor violated another provision specifically exempting a debt from discharge, section 523(a)(4), which provides for nondischargeability of a debt "for fraud or defalcation while acting in a fiduciary capacity." Plaintiffs must prove that (1) the defendant was obligated to the plaintiff in a fiduciary capacity; (2) the defendant committed fraud or defalcation while acting in his fiduciary capacity; and (3) the plaintiff's debt resulted from such fraud or defalcation. *In re Stone,* 91 B.R. 589, 593 (D.Utah 1988).

■ For purposes of section 523(a)(4), the meaning of the term "fiduciary capacity" is a question of federal law which has held that the term applies only to technical trusts, express trusts, or statutorily imposed trusts and not to fiduciary relationships which arise from equitable, implied or constructive trusts or an agency relationship. *In re Piercy,* 140 B.R. 108, 114 (Bankr.D.Md.1992) and cases cited therein; *In re Evans,* 161 B.R. 474, 477–78 (9th Cir. BAP 1993). In addition, the trust must be in existence before the occurrence of the act from which the debt arose. *Stone,* 91 B.R. at 594. In other words, the

debtor must have been a trustee or fiduciary before the wrong and not a trustee *ex maleficio. Id.*

■ However, the courts must look to non-bankruptcy law to determine whether there exist the elements of a trust relationship as required by federal law for a fiduciary relationship to exist. Plaintiffs assert two grounds for finding that the defendant acted in a fiduciary capacity as contemplated in section 523(a)(4): (1) he was acting as an investment adviser under the Investment Adviser Act of 1940 (the "Act"); and (2) he was acting pursuant to a power of attorney authorizing him to make purchases and sales on behalf of his client.

#### 1. Investment Adviser Act of 1940

■ With respect to plaintiffs' first basis for finding a fiduciary capacity, a statute creating trust duties may create a fiduciary relationship as to transactions entered into that are governed by the statute. *In re Carey Lumber Co. v. Bell,* 615 F.2d 370 (5th Cir.1980). *See In re Angelle,* 610 F.2d 1335, 1340 (5th Cir.1980). A statute does so if it "contains requirements very much like those traditionally imposed on a trustee" such as requiring segregating, keeping records of trust funds and disbursing them only for purposes authorized by the statute. *Angelle,* 610 F.2d at 1340.

After a careful examination of section 80b–6 of the Act[7] and certain rules and regulations promulgated thereunder, as enumerated in 17 C.F.R. § 275.204–2, –3, and .206(4)–2, the court in *In re Peterson,* 96 B.R. 314, 321 (Bankr.D.Colo.1988), held that the Act creates an express trust relationship within the meaning of section 523(a)(4). *Cf. In re Smith,* 72 B.R. 61 (N.D.Iowa 1987) (Commodity Exchange Act creates a technical trust for purposes of section 523(a)(4)). First, any funds coming into the investment adviser's hands directly or *indirectly* form the res or particular property of the trust.

---

7. Section 80b–6 provides in pertinent part:

It shall be unlawful for any investment adviser ... to directly or indirectly—
(1) employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative....

17 C.F.R. § 275.206(4)–2. Second, section 80b–6 of the Act implies the general duty to handle client funds free from any scheme to defraud. Third, the Act and regulations set forth a prescribed method for management, control and accounting of all client funds.[8]

 This court finds the reasoning in *Peterson* persuasive and finding no authority to the contrary holds that the Investment Advisers Act gives rise to a trust that imposes a fiduciary capacity as contemplated by section 523(a)(4).[9] Therefore, the court must consider whether the plaintiffs have sufficiently alleged facts showing fraud or, alternatively, defalcation with respect to the obligations imposed on the defendant as a result of his capacity as investment adviser.[10]

 Arguably no defalcation can be found on the face of plaintiffs' complaint and I assume that is the case without finally deciding the issue for purposes of trial. There are no allegations that the defendant misappropriated the funds belonging to the Trust or traded the funds in an unauthorized fashion. *See In re Smith,* 72 B.R. 61, 63 (N.D.Iowa 1987) (unauthorized trade constitutes defalcation); *In re Sawyer,* 112 B.R. 386, 389–91 (D.Colo.1990) (broker's unauthorized purchases constitute defalcation). *But see Peterson,* 96 B.R. at 324–25 (lack of writ-

ten disclosure, failure to account for invested funds and advice dominated by adviser's own personal benefit constitutes defalcation). The defendant was granted the authority to purchase and sell securities on behalf of the trust and there is no allegation that he did anything other than what he was expressly given the authority to do.

 However, the question of fraud is different. As an investment adviser, the defendant owed certain statutorily imposed duties with respect to the investment advice provided. Plaintiffs allege that the defendant, motivated by his own self interest, fraudulently advised plaintiffs to invest the funds in the option program, knowing it was not the type of investment suitable to the Trust's needs. Providing such fraudulent advice regarding investments would constitute a breach of the obligations imposed by the Act and, therefore, plaintiffs' allegations are plainly sufficient to state a claim for fraud while acting in a fiduciary capacity. *See Peterson,* 96 B.R. at 325; Section 80b–6. Accordingly, Count IV will not be dismissed. However, because any judgment awarded under the Act will be limited to the amount of the commissions, *see* footnote 9, the court will address plaintiffs' second basis for nondischargeability pursuant to section 523(a)(4), the power of attorney.

---

8. The court in *Peterson* also noted that there is a revocable license requirement. *See* 15 U.S.C. § 80b–3(e). But it did so only because this was perceived to be critical in *In re Romero,* 535 F.2d 618 (10th Cir.1976), a decision the *Peterson* court acknowledged was "soundly criticized by other courts," 96 B.R. at 321, citing, *inter alia, Angelle,* 610 F.2d at 1335.

9. The Supreme Court has held that there is no private cause of action for damages under section 80b–6 of the Act and that only a limited private remedy to void the investment adviser's contract exists under section 80b–15. *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 19–25, 100 S.Ct. 242, 246–50, 62 L.Ed.2d 146 (1979). However, the Court noted that "[w]here rescission is awarded, the rescinding party may of course have restitution of the consideration given under the contract, less any value conferred by the other party.... Restitution would not, however, include compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction." 444 U.S. at 25 n. 14, 100 S.Ct. at 250 n. 14. *See Wachovia Bank &*

*Trust v. National Student Marketing,* 650 F.2d 342, 355 (D.C.Cir.1980); *Fed. Sav. & Loan Ins. v. Shearson American Express,* 658 F.Supp. 1331, 1344 (D.Puerto Rico 1987). Therefore, even if the court finds that the defendant engaged in fraud or acts constituting defalcation in breach of a duty imposed by the Act, the only debt that would exist under the Act would be for the amount of the commissions. *See Peterson,* 96 B.R. at 322 n. 2.

10. The fraud or defalcation must be a breach of a fiduciary duty shown to satisfy the requirements of § 523(a)(4). *See, e.g., Stone,* 91 B.R. at 594 (upon showing debtor was a trustee pursuant to statute, defalcation must have occurred while debtor acted as trustee and not while acting in ordinary commercial setting). In other words, the plaintiff cannot sue for any fraudulent action after establishing the requisite "fiduciary capacity." Rather, the fraud or defalcation sued upon must relate to a breach of a duty arising under that fiduciary capacity established.

### 2. *Power of Attorney*

Plaintiffs assert that the power of attorney granted to the defendant imposes the type of fiduciary capacity that is required by this provision.

The defendant argues, first, that even if the court assumes that the power of attorney imposes the type of trust relationship as required by the provision, plaintiffs' allegations with respect to the power of attorney fail to provide a basis for nondischargeability pursuant to section 523(a)(4). As mentioned above, the trust must have been in existence before the alleged wrongful acts occurred. However, the misrepresentations by the defendant occurred prior to entering into the power of attorney. The defendant urges that plaintiffs do not contend that the defendant committed any acts of defalcation after the power of attorney was granted or acted fraudulently in exercising the power of attorney. Rather, they allege that defendant's representations induced them to invest in the options program, which also resulted in granting the defendant a power of attorney.

The court must reject the defendant's first argument. A trustee who obtains a beneficiary's acquiescence to a risky investment based on a misrepresentation enjoys no immunity from damages merely because the misrepresentation pre-dated the trust relationship. The wrong, while acting in a fiduciary relationship, is the making of the investment with knowledge that the beneficiary has been previously misled as to the investment's safety.

The defendant argues, second, that there is no allegation that the defendant did anything other than what the power of attorney permitted. But a power of attorney may impose a fiduciary relationship. *In re Barwick*, 24 B.R. 703, 705–706 (Bankr. E.D.Va.1982) (applying Virginia law as to power of attorney in evaluating § 523(a)(4) claim); *In re Burgess*, 106 B.R. 612, 620–21 (Bankr.D.Neb.1989) (evaluating all the facts and circumstances surrounding relationship in concluding that a fiduciary relationship arose out of power of attorney). *But see In re Lang*, 108 B.R. 586, 589 (Bankr.N.D.Ohio 1989) (mere appointment as attorney-in-fact in subscription agreement arose from ordinary commercial transactions, not a technical trust). A fiduciary who acts according to the literal terms of a trust instrument but who does so against the best interest of a knowingly misled beneficiary is guilty of a defalcation.

The court recognizes that the question is not free from doubt and will welcome at trial additional briefs on the question of what state law applies and whether that law creates a fiduciary relationship in the case of a power of attorney. The answer may be that no true § 523(a)(4) fiduciary relationship exists. Or, if one exists, the duty in the fiduciary relationship may be limited to carrying out the beneficiary's instructions, with any duty to disclose that the beneficiary has been given false information in reaching the decision to make the instruction originating in other law than that governing the fiduciary relationship.[11] But these are all questions that ought to be fleshed out at trial on a full factual record regarding the power of attorney and the relationship that evolved around it. The court already has to try the question of fraud under § 523(a)(2)(A) and it will not substantially alter the trial to keep the power of attorney issue alive.

Accordingly, plaintiffs' § 523(a)(4) claims based on allegations that the defendant acted fraudulently while acting as an investment adviser under the Act and while acting under a power of attorney will not be dismissed.

---

**11.** See footnote 10, *supra.*